### Prewitt v. Caudill.

### Caudill v. Prewitt.

(Decided Oct. 20, 1933.)

Dissenting Opinion Nov. 3, 1933.

E. C. O'REAR, G. CONNER EWING, W. B. WHITE, CHAS. D. GRUBBS and W. C. HAMILTON for Henry R. Prewitt.

S. S. WILLIS, J. J. WINN, HENRY WATSON, J. ADAIR RICHARDS and W. E. PROCTOR for D. B. Caudill.

OPINION PER CURIAM—Affirming in part and reversing in part.

The Honorable Henry R. Prewitt, the present circuit judge of the Twenty-First judicial district, comprising the counties of Bath, Montgomery, Rowan, and Menifee, and the Honorable D. B. Caudill were rival candidates in the August, 1933, primary for the Democratic nomination for circuit judge in the district mentioned. Under what is popularly known as the "Non-

partisan Judicial Primary Act'' (Acts 1920, c. 99), authorizing any candidate for the office of circuit judge or that of judge of the Court of Appeals to enter or be entered in the primary of any party, though such candidate be himself not a member of that party, Judge Caudill, though a Democrat, had also, entered the primary for the Republican nomination in this district. Having no opposition in that primary, he was in due time awarded the certificate of nomination as the Republican candidate for circuit judge in this district. At the primary election held in the race for the Democratic nomination, Judge Prewitt received 5,872 votes upon the face of the returns and Judge Caudill 6,028, a majority of 156 votes.

1. Under section 1550-28 of the Kentucky Statutes Supplement 1933, the last day for filing contests of nominations made in this August primary fell on Saturday, August 19, 1933. A few days previous to this, Judge Prewitt, who lived in Mt. Sterling, called up Charles E. Jennings, clerk of the Rowan circuit court, and informed him of his intention to file a contest of Judge Caudill's Democratic nomination on Saturday, August 19th, and requested Jennings to be in his office or available until at least 5 o'clock in the afternoon of that day for the purpose of receiving and filing the petition and issuing the summons. As Judge Caudill lived in Morehead in Rowan county, it was necessary that the contest proceedings be filed in the Rowan circuit court. Jennings assured Judge Prewitt that he would be available on. that day. On Saturday morning, about 10 o'clock, Judge Prewitt arrived in Morehead with his petition, but was unable to find the clerk. The reason for his inability to find the clerk was this: On the preceding Friday afternoon, after having been seen in conference in an automobile on the streets of Morehead with Ezra Proctor, brother-in-law of Judge Caudill, Jennings was suddenly seized with a wanderlust, and that evening, with his wife and infant child, left Morehead in his automobile to visit foreign climes. He says that his destination was New York. Having revoked, some eight or nine months previous to this, the appointments of all of his deputies, this departure of Jennings from Rowan county left his. office without any one in charge or any one who could receive and file papers or issue any process. Jennings spent Friday night at Ash-

land and left there about 11 o'clock the next morning. He could have stayed at Morehead Friday night and left there the next morning after Judge Prewitt's arrival and reached Ashland not much after the time when he left Ashland Saturday to continue his journey. He drove to Charleston, W. Va., and, after looking over the new capitol and driving up the Kanawha river a piece and admiring the scenery, he returned to Charleston and there spent the night. Having decided that he had seen enough of the world for the time being, he gave up the idea of visiting New York and turned back towards home on Sunday. He got to Louisa, Ky., about the middle of Sunday afternoon, and there read in the Ashland Independent that Judge Prewitt had filed a contest suit and that he was endeavoring to locate the clerk. The paper also carried the news that a special judge was expected in Morehead on Monday morning in this contest proceeding. Jennings testifies that he then made up his mind to return home. But, although it was only about a two-hour drive from Louisa to Morehead via U. S. 60, and he could have reached Morehead that night and been available for service Monday morning, he took the circuitous route by turning off at a right angle and going up the Big Sandy river. After reaching Paintsville, he then turned, and, passing through Salyersville, reached West Liberty, where he stayed until about noon on Monday. It took him four hours, according to his testimony, to drive about 30 miles from West Liberty to Frenchburg. He finally got to Morehead about 7:30 Monday evening. Having heard reports of criticism of him and his conduct in this matter by Judge Prewitt and his supporters, Jennings was very angry, as he admits, when he reached Morehead on Monday night. He repaired at once to a hardware store, for the purpose, as he claims, of replacing a lock in his office that had been broken by the order of Special Judge Ford who had been sent by the Chief Justice on that morning to try the preliminary motions of this contest case. A lock being defensive in its nature, and probably mindful of Napoleon's famous maxim that the best defense is an offense, Jennings bought no lock but cartridges for his .44 revolver. After having properly loaded this revolver, he proceeded at once to Mr. Caudill's law office, and there went into conference with Judge Caudill and his supporters. Judge Caudill testifies that all that is material to this controversy which

occurred at that conference was his admonition to Jennings to contain himself and not get into any trouble. Jennings admits that all along he was secretly hostile to Judge Prewitt, and that upon his return he was angry and bitterly hostile, and still entertains these feelings.

From what we have said, it is obvious why Judge Prewitt in the vigorous search he made on Saturday in Morehead was unable to locate the clerk. Nor was Judge Prewitt able to find the county judge for the purpose of appointing and qualifying a deputy circuit clerk. He, too, seems to have disappeared from the terrain and did not return until after Monday following. We are left to conjecture the cause of his disappearance, for the record is silent as to it. After a thorough search had been made, and coming to the conclusion that neither the clerk nor the county judge could be found, Judge Prewitt then lodged in the clerk's office with the jailer of the county, who was in charge of the office, the petition in this contest proceeding, together with the necessary filing fees. This petition not only attacked the Democratic nomination of his opponent, but also asked that his Republican nomination be cancelled because of alleged violations of the Corrupt Practice Act by Judge Caudill and his supporters with his knowledge and consent. Judge Prewitt thereupon issued a summons on this contest petition which he signed as Judge of the Rowan circuit court. This process was placed in the hands of the sheriff, and at once served on Judge Caudill. In addition to this, Judge Prewitt made up a notice which he signed and had served on Judge Caudill. This notice informed Judge Caudill of the filing of the contest proceeding, and was in form and substance the character of notice required in these contest proceedings under the law as it stood prior to the act of 1930, to which we shall later refer. Along with this notice was served a copy of the petition. Judge Prewitt then notified the Chief Justice of the filing of this contest proceeding and requested that a special judge be sent Monday following to hear the preliminary motions. Acting on this certification, the Chief Justice designated the Honorable Church Ford, judge of the Fourteenth judicial district, to act as special judge in this case. Judge Ford arrived in Morehead on Monday morning. To rapidly summarize what took place on that

day, Judge Ford, finding the circuit clerk still absent, and there being no available deputy, appointed a deputy clerk pro tem., and, the county judge being still absent, and hence not available to take the bond of this pro tem. deputy circuit clerk, Judge Ford took and approved the bond. Ezra Proctor, brother-in-law of Judge Caudill, and a practicing attorney of the Rowan circuit court, appeared in court with the idea of objecting to the proceedings then being had on the ground that the contest proceeding had not been properly instituted, since no valid summons had been issued on the petition, but, being warned that he might thereby enter the appearance of Judge Caudill, he took no further part in the proceedings had at that time.

Various motions made by counsel for Judge Prewitt looking to the matter for fixing the time for taking proof, subpoenaing witnesses, etc., were made, and the case thereupon continued until the following week. In the meantime, and on Thursday following, a special appearance was made on behalf of Judge Caudill for the purpose only of moving to quash the summons issued and signed by Judge Prewitt on the preceding Saturday. A praecipe was filed with the circuit clerk requesting a regular certification to the Chief Justice for the purpose of having a special judge appointed to hear this motion and try such other matters as might properly come up. The circuit clerk having so certified to the Chief Justice, Judge Ford was redesignated, and he set Monday, August 28, 1933, as the time at which he would appear in Morehead and act in the matter then pending. On that day he heard arguments of counsel and sustained the motion to quash the process issued and signed by Judge Prewitt on Saturday, August 19th. Thereupon, on motion of Judge Prewitt, an alias summons was ordered by the court and was issued by the clerk and served upon Judge Caudill on that day. Thereupon Judge Caudill filed an answer setting up the facts about this matter of process and objecting to the jurisdiction of the court. He also traversed the alleged grounds of contest and affirmatively set up a counter contest. Judge Prewitt in reply set out facts about the absence of the circuit clerk on Saturday, Sunday, and Monday, and traversed the grounds of the alleged counter contest. The court then proceeded to hear the case on the merits. After it had proceeded

704

for a bit, the parties by stipulation eliminated from the grounds of contest and counter contest every issue except that of alleged violations of the Corrupt Practice Act on the part of each party to this contest and on the part of their respective supporters with their knowledge and consent. On final hearing, the court upheld the process issued on August 28th, adjudged that both parties had knowledge of, and had consented to, the violation of the Corrupt Practice Act (Ky. Stats. sec. 1565b-1 et seq.) on the part of their respective supporters, and that therefore neither was entitled to the Democratic nomination. In so far as Judge Prewitt undertook to attack the Republican nomination of Judge Caudill, the court declined to cancel such nomination of Judge Caudill. From the judgment so entered, both parties have prosecuted an appeal. The two appeals have been heard together, and will be disposed of by one opinion.

There are three questions presented: First, the jurisdictional one; secondly, did either or both of the candidates have knowledge of or consent to violations of the Corrupt Practice Act by their adherents? and, thirdly, was Judge Prewitt entitled to attack the Republican nomination of Judge Caudill?

Addressing ourselves to the first of these three issues, we find that it is earnestly contended by counsel for Judge Prewitt that a judge of a circuit court has inherent constitutional power to act as his own clerk and to issue summonses under the circumstances here present, and that, the act of issuing a summons being purely a ministerial act, a judge may so act even in his own case. Per contra, it is just as earnestly argued that the judge of a circuit court has no inherent power to act as a clerk or to issue a summons, that the Civil Code of Practice, Sec. 40, authorizes only a circuit clerk to sign a summons, and that no one else has authority to sign a summons. We do not find it necessary to discuss or decide this interesting question of who may sign a summons. Originally, of course, common-law actions were begun by the issuance of an original writ which was an executive order from the King acting through the clerks in chancery, the purpose of which was not only to notify the defendant of the pendency of the action and to require him to attend and defend, but also to give the particular court in question jurisdiction of the cause. See Shipman, Common Law Pleading (3d Ed.) p.

17. In modern practice, of course, no writ is necessary to give the court jurisdiction of the subject matter, and the writ or summons is used as a means of notifying the defendant of the suit and ordering him to appear in court. It would seem, however, that the summons is still the command of the sovereign by whose authority the tribunal out of which it issues was established commanding the person or officer to whom it is directed or who is authorized to execute it to do certain acts therein specified. Whence it is that processes run in the name of the commonwealth of Kentucky. See section 123 of the Constitution. See, also, Yeager v. Groves, 78 Ky. 278. We may concede, for the purpose of this case, that the summons issued by Judge Prewitt was void. It is true that, in order to commence an action in this state, not only must the petition be filed, but a summons must be caused to be issued thereon or warning order made. Civil Code of Practice, Sec. 39. Unless the plaintiff in good faith cause a summons to be issued or warning order made within the period of limitations, the suit will be barred by limitations. See Louisville & N. R. Co. v. Napier's Adm'r, 230 Ky. 323, 19 S. W. (2d) 997. Hence it is argued by appellee that, if the summons issued by Judge Prewitt on August 19th be invalid, as that was the last day on which a contest proceeding could be filed, limitations has run against this proceeding, and it is coram non judice. In the case of Ward v. Howard, 177 Ky. 38, 197 S. W. 506, 510, an analogous question was presented. That was an election case, and, in order to vest the appellate court with jurisdiction to hear the appeal, a supersedeas bond had to be executed before the circuit clerk on a certain day. The judgment had been entered about 5 o'clock in the afternoon of that day, and the contestants' attorneys informed the clerk that they desired to execute supersedeas bond, and were told by him that he would be in his office after supper and take the bonds at any time before 12 o'clock that night. Relying on this assurance, the contestants' attorneys appeared in the clerk's office with good sureties after supper and about 7:30, and offered to execute the bond, but the clerk refused to permit them to do so, closed his office, and thereafter could not be found that night, though diligent search was made for him. In discussing the question whether or not the contestant should lose his right of appeal because of this action on the part of the circuit clerk, this court said:

"The question now is, can the clerk by deliberately absenting himself from his office, or by closing his office, or by concealing himself, or by refusing to take the bonds, deprive the contestants of their right to take appeals? If this statute should be so strictly ·construed as that this court would not have jurisdiction under any conditions or under any circumstances unless the bond was executed on the day the judgment was rendered, it can readily be seen that. in many cases the contestant, without any fault or neglect on his part, and although he may have made every reasonable effort to execute the bond on the day the judgment was rendered, would be denied the right of appeal, by the conduct of the clerk, or. by some other condition that could not be anticipated or provided against.

"But we do not think the statute should be so strictly and harshly construed. Its purpose was to hasten the procedure in these cases and not. to deprive the contestant of the right to appeal for the failure to execute a bond on the day of the judgment when, by circumstances beyond his control, he was prevented from executing it on that day.

"In Powell v. Horn, 159 Ky. 532, 167 S. W. 928, we had before us a question involving the right to file a pleading in a contested election case within the time allowed by the statute, which specifically fixes the time in which pleadings must be filed in this class of cases. In holding that strict compliance with the statute was not indispensable in all cases, and that if sufficient reasons were shown why a pleading, not filed within the time provided by the statute, but very soon thereafter, should be permitted to be filed, it was said:

" 'When an answer or reply is offered to be filed after the statutory period has expired, it should be accompanied by affidavits or other proof showing good reasons why the pleading was not filed in proper time, for unless a good excuse is shown, the statute is peremptory and must be complied with. If, however, the answer, or reply is filed very soon after it is due, and· it affirmatively appears that a good excuse for the delay existed, arising out of unusual or extraordinary conditions appearing in the

record as in this case, or due to accident or surprise which ordinary prudence could not have guarded against, or resulting from unavoidable casualty or misfortune, and also that the substantial rights of the adverse party were not prejudiced by the delay, we think the matter of allowing or refusing to permit the pleading to be filed is within the sound discretion of the trial court. But nothing short of an excuse resting on one of these grounds will be available or deemed sufficient to avoid the statute.'

"In Creech v. Brock, 159 Ky. 739, 169 S. W. 483, it was held that where sufficient reason was shown for the delay this court might extend the time of filing a transcript in an election contest case, although the statute provides that the record must be filed within a specified time, saying:

" 'When from the size of the record or some misfortune or casualty it is utterly impossible to obtain and file a transcript within 30 days, justice would be defeated if no extension of the time could be allowed. The purpose of the statute is not to defeat justice, but to secure a speedy determination of the case. It provides for a judicial decision of the controversy, and the judicial proceeding must be subject to the control of the court, in the absence of something in the statute denying this power. If we held otherwise, the purpose of the statute in allowing an appeal to this court would be defeated in all cases where it was for any cause impracticable to file the transcript within 30 days. We therefore conclude that the court may for sufficient cause extend the time for filing the transcript.'

"The statutory requirement prescribing the time when the pleadings and transcript shall be filed is as mandatory as the requirement when the bond shall be executed, and there is no good reason why the rule announced in these cases should not be applied here. No litigant should be denied the right to prosecute an appeal on account of his failure to execute a bond within the time allowed when this failure is due to casualty or misfortune or circumstances beyond his control, and the delay will not prejudice the substantial rights of his adversary. Com. v. Weissinger, Judge, 143 Ky. 368, 136 S. W.

875; Chicago Life Ins. Co. v. Robertson, 147 Ky. 61, 143 S. W. 740.

"We therefore hold that when it is made to satisfactorily appear that the contestant was prevented from executing the bond on the day the judgment was rendered by unavoidable casualty or misfortune, or accident or surprise which ordinary prudence could not have guarded against, or by circumstances beyond his control, he may execute the bond on the day following and it will have the same effect as if executed on the day the judgment was rendered."

It was held, however, that, as no attempt had been made thereafter by the contestants to execute the bond, the contestant did not bring himself within the rule thus laid down. In the instant case, the circuit court in substance found that the earliest practical time that the contestant could have had the process issued by Jennings was on Monday, August 28th. Judge Caudill challenges that finding, but we are in thorough accord with the circuit court's conclusion in this regard. The outrageous conduct of Jennings, his willful and premeditated absence from his office, the circumstance of his having been seen in conference with Ezra Proctor, of whom much was heard during the trial, prior to his departure from Morehead, arming himself on his return, his immediate seeking of a conference with Judge Caudill and his supporters, and his admittedly angry and bitterly hostile attitude towards Judge Prewitt, inevitably lead the reasoning mind to the conclusion that it would have been utterly futile and foolish to have attempted to have Jennings do anything except under and by order of court. This was done on Monday, August 28th, the day Judge Ford had set to hear the motions to quash the process issued by Judge Prewitt. Judge Caudill was not prejudiced by this delay, for he was fully aware of the filing of the contest proceeding, and had been furnished with a copy of the petition. Under all the circumstances, we are of opinion that the rule in Ward v. Howard must be applied, and that summons was issued at the earliest practical time it could have been, and that the delay in its issuance was due to the contumely of the circuit clerk, over whom Judge Prewitt had no control and for which he should not be

charged. The trial court properly held that it had jurisdiction of this contest proceeding.

2. The voluminous record is replete with conclusive proof that much money was spent illegally in behalf of the contestee Caudill. As has been often stated, that in itself is not sufficient under the statute to deprive the beneficiary candidate of his nomination. There must be proof, either direct or inferential, that he was personally guilty or had knowledge that the things condemned by the Corrupt Practice Act would be or were being done, and that he ratified them affirmatively by acquiescence. Time does not permit, nor the conclusion demand, a detailed recitation of all the evidence. We may omit reference to the greater part of the story of the evil agreements and unlawful activities of the candidate's kinsmen and friends throughout the district— not because they are immaterial, but as being of less importance to the decision and because Caudill's knowledge of them is less certain. Some of those things were so extensive and committed in such proximity to him as to create the strong impression that he was aware of what was being done and tacitly ratified it. We look to the direct conduct and the admissions of the candidate. The consideration of this evidence should be prefaced with the record that Judge Caudill denied any wrongful purpose and all knowledge of wrongful acts of others; and further that he testified, and many witnesses sustained him, that throughout the campaign he was declaring he would countenance nothing illegal. Those who confess their conduct say knowledge of it was carefully concealed from Judge Caudill.

(a) Judge Caudill testified that his brother, Dave Caudill, had told him he would hire some automobiles in Menifee county; but two men approached him and said they had been using their cars and working and talking for him, and needed some money, so he gave them $2 each. He met up with Louis Frailey, and inquired whether he would be able to get out all the vote at Hogtown, and, when he said he did not know, Judge Caudill gave him $5, with the request that he haul every Caudill vote that he could get. For the same purpose he gave Bill Wagner that sum. At Haldeman, although he was advised that the voters would "mostly be out," he gave a boy named Cox $5 for the use of his car. At Mt. Sterling, out at Marshall's home, among his friends

who had agreed to help him, was one who said he would use his automobile but did not charge anything for it, but, he nevertheless gave him $5 for gasoline. On Wednesday before the election he stopped at Tom Rogers' home. Believing that he could not go on to other places through there, he gave Rogers $25 to get out the vote in that precinct for him. Rogers promised to do so, but did not think it would take that much money; yet Caudill left it with him. That night he met up with Wes Wheeler and invited him to come to Mt. Sterling and they would talk about getting the vote out through that section. That same night Wheeler and another man came, and Caudill gave each of them $10 "to go back out there and work up the votes." Wheeler says he had $25 on the day of the election, but there is evidence that he had a larger sum, and much of it went for the purchase of votes. That same night Judge Caudill says he gave $5 or $10 to each of two or three men, but does not say what for. There were also further admissions of having given without solicitation from $2 to $15 to different persons for gasoline, and in some instances the money was given to men who did not possess an automobile. Several of these recipients were regarded as active workers in elections.

About a week before the primary, he sent $200 to Kelly Richards at Owingsville to get out the vote in Bath county. It is inferable from the evidence that Mr. Richards, who was the chairman of the Democratic county committee, was instrumental in effecting what Judge Caudill calls "the election officer organization." He testified that it had been hard to get good election officers in several places in that county, and he was seeking to have the highest class citizens appointed. Richards co-operated along this line, Caudill stated. But the money was actually used for a more "practical" purpose. Richards testified that he had previously suggested to Judge Caudill that it would take money to carry the county because of the large number of "floaters." He had responded that he was willing to put in a reasonable amount for organization purposes, but would not spend any money for illegal use, and maintained that attitude throughout the campaign. However, the $200 check was promptly indorsed and given to John Adair Richards, the nephew of, and an active worker for, J. L. Atcheson, a candidate for county

judge. Later Kelly Richards attended a meeting where $1,000 was put in for Caudill in a pool of bribery money, as will be more particularly referred to.

An argument arose at Salt Lick as to whether a Republican who had voted for Roosevelt in the preceding election, was eligible to vote in the Democratic primary. Judge Caudill insisted that he was, and told one Elswick, who was of that class, that, if he would vote and should be fined, he would put up $100 for him, and according to that promise Caudill did deposit $100 in the local bank for that purpose.

Without detailing the items, Judge Candill admits, having voluntarily given to a number of different candidates for county offices sums varying from $5 to $15 to ride the county for him or to get out the voters to the polls. Some of these candidates in testifying denominated the sums paid them as contributions or donations towards the expense of the election. Frank Sorrell, a Republican, testified that at Frenchburg Caudill gave him $2 with which to buy gas, he said, although Sorrell did not own an automobile. At the same time he gave Ed Robinson, a Republican precinct chairman, $2. When the latter recommended the former as having the ability to handle election money, Judge Caudill said he was not going to buy a vote, but naively added he had a brother who "may be down this way this evening."

Subsection 3 of the Corrupt Practice Act (section 1565b-3, Statutes) declares it to be unlawful for a candidate to expend or pay money, either directly or indirectly, or to agree or enter into any contract with anyone in consideration of the "vote or support, moral or financial, of any such * * * person." However, there are excluded expenditures for certain specified things.

In the first case construing this law, Van Meter v. Burns, 176 Ky. 153, 195 S. W. 470, it was held that among things to be recognized as proper and legitimate were the reasonable expense of distributing advertising matter and hiring conveyances for the purpose of getting the candidate's friends to the polls. But the principle is there clearly laid down that the intent of the law will not permit the employment of such a number of persons or the payment of sums disproportionate to the services required as to justify the conclusion that the employment was not in good faith or the pretended

compensation paid merely for the purpose of securing their votes or influence in the election. With particular reference to the hire of automobiles it is declared to be illegitimate if the support of another in the election is part of the consideration or the compensation is so large as to justify the inference that it was paid for the purpose of obtaining his support or influence. Cf. Walker v. Taylor, 230 Ky. 689, 20 S. W. (2d) 727; Miller v. Maier, 136 Minn. 231, 161 N. W. 513, 2 A. L. R. 399.

The indiscriminate distribution of money ostensibly for the legitimate purposes of hiring automobiles and of paying for gasoline does not appear in many instances to have been in good faith as demanded by the law. With few exceptions, there was no sort of definite understanding or agreement respecting the subject-matter. The employment and reason for the payments were too hazy and unsubstantial to be recognized as legitimate transactions. Of like character is the promiscuous contributions to the many candidates for other offices. Those men did not require compensation to ride the county to get out the vote. Of course, they did those things in their own behalf, and we cannot get away from the thought that the money was paid and accepted under disguise and in reality to secure their support. Deferring to Judge Caudill's reason for making it, the payment of $200 to the county chairman of Bath county must also be regarded in this class. And we must interpret the promise to Elswick that, should he vote and be fined because of ineligibility, he would contribute $100 in payment of the fine or towards his defense, as coming within the terms of the act declaring it unlawful to promise or become pecuniarily liable or enter into a contract as a consideration for the vote or support of any person.

In the light of the interpretation given the statute in the Van Meter Case, and of the same views yet entertained by the court, we think Judge Caudill misconstrued the law, and he must be held guilty of its violation on account of these various contributions and promises.

(b) On Wednesday night preceding the election, Judge Caudill and Ezra Proctor stayed at a hotel in Mt. Sterling. There was much activity there in the

room occupied by Proctor and adjoining that of Judge Caudill. A meeting of local adherents was held at which purchasable votes were identified and plans were made for the distribution of money in Montgomery county. Early Thursday morning Bob Catlett, a candidate for sheriff of Bath county, appeared and ate breakfast with Judge Caudill and talked with him in the lobby of the hotel. At two o'clock that morning he had visited Dave Caudill at Morehead and came from there to Mt. Sterling. Dave Caudill, a brother of the candidate and president of one of the family's two banks, came over from Morehead early that day and held a conference with Proctor and Catlett at which it was agreed that Judge Caudill should be put on a slate with Catlett and J. L. Atcheson, candidate for county judge, and their money pooled. It is established that Judge Caudill was not immediately present at any of these several conferences, but was in the hallway and about the hotel. Thursday night Proctor and Dave Caudill attended a meeting of their confederates at Owingsville, at which Kelly Richards, who had previously received $200, was also present. It was then definitely agreed that Catlett and Atcheson should each put in $2,200, and that $1,000 would be put in for Judge Caudill. He testifies that he was pretty sure he was at his home in Morehead that night.

In his examination in chief, Caudill did not disclose that early Friday afternoon he had taken Ezra Proctor from Morehead to Owingsville. Proctor was carrying $2,300 in currency (practically all in dollar bills) in his brief case. He handled it cautiously. During lunch with Caudill he held the bulky bag on his lap. On the journey he carried it on his lap or perhaps part of the time at his feet in the car. This did not excite Caudill's suspicion, so it is testified. Proctor says Caudill thought he had pictures. It was an unusual thought that a campaign manager should be carrying around so many of his candidate's placards on the eve of election day. But, as counsel for contestant suggests, there were pictures in the bag—2,300 of them—and every one a picture of George Washington! Upon arrival at Owingsville, Proctor left the car to meet with his coconspirators in the room of Kelly Richards. There he emptied the money out on the bed, and the others laid down their $4,400. During that afternoon at least a sub-

stantial part of the pool money was distributed among the actual vote buyers. Proctor carried part of this burden of distribution. As he was preparing to take the bus back to Mt. Sterling, Judge Caudill conveniently, though accidentally, showed up and took him there. Not long after arrival at the hotel room adjoining that of Judge Caudill, Proctor proceeded to put into the proper hands $875 for use in Montgomery county. Although he admits having $2,300 in the brief case when he went to Owingsville, it is shown, when he emptied it in the presence of his confederates, there was only $1,000 in there. It does not definitely appear what Proctor did with the remaining $1,300 with which he started out. We may fairly suspect it was placed in the custody of Caudill in the meantime, for, according to the evidence, that afternoon he pulled out of his pocket a ''bunch of bills'' and at least offered to give the whole of it to Van Y. Greene for a hickory stick, and there was only $875 accounted for in the distribution made by Proctor at Mt. Sterling. And Judge Caudill that evening personally gave $50 to Albert Botts for Franklin Reynolds who had become peeved with the small sum of $210 which had been allotted him for use.

We return to Owingsville for that Friday afternoon. It was evidently while Proctor was busy with his Council of Munitions that Judge Caudill met up with Van Y. Greene, a capable vote buyer, as he himself admits. He showed him a list upon which appeared his name and that of Johnson Razor, both of whom he advised were to use his money at Salt Lick. All of this is denied by Judge Caudill. Of the pooled money it is certain that $250 was given Green by Catlett. But Green claims that he did not know that he had any of Caudill's money, for, although Judge Caudill had left him under the impression that he would get some, and his brother-in-law, Bert Proctor, a week before had told him he would be there with money, they had not given him any. On the day of the election, word got out that Greene was at Salt Lick working for Judge Prewitt. Judge Caudill came there. According to Greene, he told him that it was his money he was using, and, when told that he had got it from Bob Catlett, Caudill insisted that it was his money, saying that $500 was to come there, one-half to be given Greene and one-half

to Johnson Razor, and he could prove it. He wanted Greene to go with him to see Catlett, but he declined to leave his post of duty. Then Caudill left, saying that he was going to have action on his money; and perhaps in half an hour Ezra Proctor showed up and told him he had not only Caudill's but Atcheson's money also. Wm. Greene and Arthur Harper corroborate Van Greene as to the conversation; they having overheard part of it. Beckham Perry testified Caudill told Greene to "get results, I'll be back as soon as I can." Sherman Crouch says he saw Caudill talking with Greene, and he went over where they were, but there was not much said after he arrived as Caudill soon left, but he did hear Caudill tell Greene not to be too hard on him. Judge Caudill had previously testified under cross-examination that he had driven out to Salt Lick that election morning because he "was just driving around." It was the only polls he visited outside his home county. There was another at Salt Lick, but he did not call there. He merely spoke to Greene, he deposed, and had no conversation with him, but he told Caudill, nevertheless, "I am buying votes for Prewitt." He then drove straight home to Morehead. On the way he met Ezra Proctor and spoke to him, but did not remember saying anything to him about the election. It was in the middle of his own heated election, and Proctor had been his most active campaign manager. Ezra Proctor substantially corroborates Greene and the other witnesses about his coming there soon after Caudill left and that he insisted that it was Caudill's money he had and that he should quit fighting him. Greene promised to do so, and Proctor left Crouch on guard to see that he did. Greene says after being convinced it was Caudill's money in part, he bought votes for him.

As suggested already, there is other evidence showing Judge Caudill's knowledge of illegal acts of others in his behalf. The coupling of all these events, together with the significance attaching to them, forms a chain of circumstances that makes inescapable the conclusion that the candidate had knowledge at least of the Bath county financial arrangements, and particularly that part of the money which was traced into the hands of Van Greene and used by him for bribery.

The court has had no difficulty in sustaining the

judgment canceling Judge Caudill's certificate as the nominee of the Democratic party.

(c) On the counter contest against Judge Prewitt, it was established that his sons particularly, and some other zealous friends, put money into the hands of various workers, much of which found its way into illegal channels and was used for bribery. All of the parties concerned with and having knowledge of this testify that Judge Prewitt knew nothing about it. His sons carefully concealed from their father their activities of this sort, for he had demanded that no money be spent illegally in his behalf. All of the witnesses support Judge Prewitt in his testimony that from the beginning to the end of his campaign he had declared his unwillingness to participate in or benefit by such wrongful use of money, and that he had no money and was not going to spend any in the election. But it is argued by the contestee that the circumstances contradict this verbal evidence of exoneration, and that it is a logical inference, having the quality of proof, that he did know his sons were putting money into the hands of men who would buy votes with it and ratified their conduct by acquiescence—even as we have held as to Judge Caudill.

Reid Prewitt testified that two or three weeks before election he learned of a meeting of Caudill's supporters at which it was agreed to raise money for him. His brothers, one of whom lives in Bourbon county and the other in Frankfort, met at his father's home, which is also his home, on Sunday ten days before the election, and that the three of them agreed to contribute to a fund, the amount of which was left up to him. There was put up about $1,100 in his hands. Undoubtedly there was much more than that sum used in the election. Reid Prewitt denies that he, individualy, purchased any votes. It is immaterial who did it. It was done. The conversation took place on the back porch of the home, and there is nothing whatever to oppose the evidence that Judge Prewitt knew nothing about it. We cannot conceive that he knew about it from the mere fact that the conversation occurred in his home. There is an absence of anything to show his knowledge of this arrangement or his whereabouts sufficient to warrant the inference of knowledge.

Reid Prewitt, who is county attorney of Montgom-

ery county, has a suite of offices in Mt. Sterling. Although Judge Prewitt has an official office in the courthouse, he has his name on one of the doors of his son's suite. He receives his mail there, sometimes uses the services of his son's stenographer, and is generally about those offices. The day of the election it appears that men were coming and going, calling upon Reid Prewitt. When H. B. Prewitt (no relation) was with Reid in the front office to receive money, but after it had been given him, Judge Prewitt passed through into an adjoining room without speaking. He testified that he had been taken suddenly ill and closed the door, adjusted a truss he was wearing, and laid down. After remaining there alone for perhaps half an hour, he left Mt. Sterling and continued his visitation of the voters. No money was visible nor any other demonstrative evidence was apparent as he passed through the room. All the parties testify to this fact. Judge Prewitt says he heard nothing and knew nothing of what was going on, and did not learn of it until his son testified upon the trial of this case. James Greene testified to being in the office during the day and to having received $50 from Reid Prewitt. During one of his calls Judge Prewitt was in the other room, but, when he got the money, no one else was present and Judge Prewitt was not there.

This is all the evidence throughout the record tending to establish a guilty knowledge by Judge Prewitt.

We lay aside the positive testimony of innocence. Can the candidate be charged with knowledge and consequent ratification of the improper use of money in his behalf? To do so the incrimination must rest upon imputation of knowledge or upon an inference of knowledge rising to the height of proof of knowledge. The common meaning of imputed knowledge or liability is to attribute it to one on account of another or to hold one vicariously responsible for the knowledge of another, such as a principal and agent. The legal doctrine of imputed knowledge of conditions necessarily rests upon the duty to know or the assumption of responsibility for the undisclosed acts of another. The Corrupt Practice Act does not fasten liability upon the candidate by the application of that doctrine. It does, of course, permit the courts to infer a knowledge on the part of the candidate from evidence showing that he was aware of certain facts and circumstances. That is

but to recognize proof of actual knowledge by circumstantial evidence.

We quote from the recent opinion of Scalf v. Pursifull, 250 Ky. 447, 63 S. W. (2d) 504: ''Some courts in referring to the knowledge by the candidate of bribery committed by his friends and supporters denominate it 'imputed' knowledge, but which term is not an apt designation, since such knowledge of the candidate is actual and not imputed, and which the courts find to be established from the convincing facts and circumstances of the case, notwithstanding the candidate's denial.''

See, also, Douglas v. Greene, 231 Ky. 44, 20 S. W. (2d) 1026. Actual knowledge of the candidate of the illegal acts of another in his behalf is an indispensable element to be established. It cannot be inferred from merely suspicious circumstances of a vague character.

After a careful consideration of all the evidence, the court is of the opinion that it was not sufficient to justify the conclusion that the wrongful activities of Judge Prewitt's son and his zealous friends were brought to his knowledge and that he cannot be held accountable therefor.

3. Thirdly, is Judge Prewitt entitled to attack the Republican nomination of Judge Caudill? Section 1550-6 of the Kentucky Statutes, the latter portion of which comprises what we have heretofore referred to as the ''Non-partisan Judicial Primary Act,'' provides in part: ''Before any successful candidates for such judicial nomination or nominations shall be given his certificate or certificates of nomination, he shall file with the clerk of the county court, in which he resides, a statement that during the campaign for the said nomination or nominations he did not, and while a candidate for the said office will not knowingly violate any election law or any law defining or relating to corrupt and fraudulent practice in campaigns or elections in this state.''

It is argued that under these provisions the candidate is not a candidate for any particular party nomination, but is a candidate for the *office* of circuit judge, and that, if he appears in more than one party primary, he is yet but a candidate for the office of circuit judge, and that, although his hands may be entirely clean in one of the primaries, and although he may, indeed, as

in the instant case, received one nomination without opposition, yet, if he violates the Corrupt Practice Act in securing the other party nomination or attempting to secure such other party nomination, he may not only have the certificate of nomination which he corruptly obtained cancelled at the instance of his adversary in such primary, but also his other certificate cancelled, although such adversary makes no claim to such other nomination or was not even a candidate for that other nomination. It is argued that, while this contention is novel and has never been advanced before in this state, yet the Corrupt Practice Act and the quoted provision from the Nonpartisan Judicial Primary Act reveal the policy of the Legislature to deal severely with those who bribe or corrupt the electorate by depriving them of their nominations and that to take the step forward here requested by Judge Prewitt would bring about a wholesome result, especially in view of the fact that the office in dispute is one of the most important offices in the governmental machinery, and one calling peculiarly for high standards of ethical conduct. Time and again in the cases of offices other than judicial offices, the point not having heretofore been raised in regard to the judiciary, this court has called attention to the fact that a candidate whose nomination has been taken away from him because of violations of the Corrupt Practice Act may under existing law be at once renominated by his party committee and thus defeat the very policy of the act. We have stated time and again our position that this situation is one that should be corrected by the Legislature. But, despite the many opinions of this court to that effect, the Legislature has not yet seen fit to do so. It is argued that, though our hands may be tied with reference to other offices, at least we have opportunity, where judicial offices are concerned, to overcome by a *liberal* construction of the Nonpartisan Judicial Primary Act this defect in the law. All this is appealing, but it must never be forgotten that courts are established to administer law and not to legislate. That courts of law have no inherent jurisdiction of political matters or to pass upon the validity of elections or to try contested election cases is settled. Whatever power they may have in such matters must be derived wholly from statutory authority, and must be given expressly or by necessary impli-

720

cation. To a student of our institutions, the reason for this rule of law is apparent and its soundness unquestioned. It would be an act of pedantry to repeat the reasons for this wholesome and salutary rule. Suffice it to say that this court through a long line of unbroken decisions has adhered to it. To cite but one, in the case of Dodge v. Johnson, 210 Ky. 843, 276 S. W. 984, 985, it was contended that in the primary election to nominate commissioners for the city of Lexington fraud and corruption had prevailed and illegal votes had been cast, for which reasons the election should be set aside. We declined even to entertain the contest, since there was no statutory authority authorizing a contest of primary nominations for such offices. In so doing, we quoted with approval the following from Patterson v. Knapp, 125 Ky. 474, 101 S. W. 379, 31 Ky. Law Rep. 108:

"Courts of equity have not inherently and had not at common law, the jurisdiction to try contested election cases. Nor have any other courts, for that matter. Such jurisdiction exists only when it is conferred by Statute. However desirable it may be that some tribunal should be provided in which a contest might be instituted and tried, be the matter involved either the selection of public officials or the imposition of a tax upon the people by the vote of the electors, that is a question that addresses itself to the discretion of the Legislature."

Hence, where the question is whether the courts are powerless to give relief where a definite and fixed policy has been declared in the statutes, the answer in these political matters, such as contested election cases, must be "yes," unless the Legislature has itself prescribed the remedy. In deciding the question here under discussion, we must remember that, after all, there is no such thing as a nomination merely "for circuit judge." The nomination is a party nomination, although the candidate may be the candidate of more than one party. There is no provision to be found in our Statutes for contesting a nomination for circuit judge, no matter how corruptly or how illegally obtained, save chapter 50 of the Acts of 1930, adopted after the Nonpartisan Judicial Primary Act was passed. This 1930 act which is now section 1550-28 of the Kentucky Statutes Supplement 1933, radically changes the wording of the contest

statute in primary elections which prevail prior to the act of 1930. (For the old act, see the same section number in the 1930 edition of the Statutes.) It specifically provides: "Any candidate who was voted for at any primary election under this act may contest the right of any candidate *to the nomination claimed by him.*" (Italics ours.)

It thus appears that a candidate's nomination is subject to attack by contest only at the instance of one who makes claim to the *same* nomination. In the instant case, Judge Prewitt made and makes no claim to the Republican nomination in his pleadings or otherwise. Were Judge Caudill's Republican nomination cancelled, Judge Prewitt could not get it. We have seen that, in cancelling the Democratic nomination of Judge Caudill, it was awarded to Judge Prewitt, but the like relief cannot be given with regard to the Republican nomination because Judge Prewitt never entered the Republican primary and never claimed even by his own pleadings such nomination. As heretofore stated, there is no such thing as a "nomination for circuit judge." In the fall elections a candidate who has both the Republican and Democratic nominations does not have his name printed in any special place on the ballot as "nominee for circuit judge." On the contrary, his name is printed under each party emblem, and the voter still has the choice of writing under the emblem of the party for which he wishes to vote the name of some other person than that of the judicial candidate who holds, indeed, both party nominations. We thus see that in theory the candidate is yet the candidate of a party, although perhaps of both parties. It inevitably follows that Judge Prewitt was not claiming "the nomination for circuit judge," since there is no such office, but that he was claiming the Democratic nomination for the office of circuit judge. He never claimed the Republican nomination, for which reason we can find no provision anywhere in the law authorizing him to contest the Republican nomination of Judge Caudill. It might be that it would have been very wise to have vested Judge Prewitt with such authority, but the Legislature has not seen fit to do it. Sometimes it is thought that, in order to reach what appears to be a desirable result, courts should take a short cut. But there are too many way stations along the road whose

existence is not thought of, or perhaps unknown, to warrant such precipitate action. It is a wise policy to adhere to rules which experience has tested and found sound. As we have pointed out, one of the most fundamental rules running through our jurisprudence is that courts should not interfere in political matters except to the extent, and only to the extent, that they are commanded so to do by the people acting through their Legislatures. Finding no place in the law authorizing Judge Prewitt to contest the Republican nomination of Judge Caudill, under the pleadings and proof in this case, a majority of us are of the opinion that the lower court did not err in declining to cancel Judge Caudill's Republican nomination.

The judgment of the lower court in so far as it cancelled Judge Caudill's Democratic nomination and refused to cancel his Republican nomination is affirmed. In so far as it declined to give Judge Prewitt the Democratic nomination, it is reversed.

The statute governing contests in primary elections vesting in us the authority to enter final judgment, it is considered, ordered, and adjudged that Judge Prewitt is hereby entitled to and is awarded the certificate of nomination as the Democratic nominee for circuit judge in the Twenty-First judicial district of the state of Kentucky, and the clerk of this court will so certify to the proper authorities.

Whole court sitting.

Judges Thomas, Richardson, and Perry dissent from so much of the opinion as holds that Judge Prewitt in this action is not entitled to the cancellation of the Republican certificate of nomination of Mr. Caudill.

Thomas, Justice (dissenting).

At the hearing of these two appeals, another member of the court and myself were not convinced that the evidence was insufficient to authorize an inference of knowledge on the part of Judge Prewitt of corrupt practices indulged in by others, including his sons, in his behalf on election day, and being of that opinion, and being admonished that some effect should be given to the same conclusion of the trial court, we did not coincide with the majority opinion in its findings on that issue. However, since the question was, to say the least of it, enshrouded in doubt, we determined to regis-

ter no dissent from the conclusion of the majority of the court thereon, and had it not been for the disagreement on the issue discussed below, there would be no registered dissent or any dissenting opinion in these appeals.

The opinion holds that Judge Prewitt, as a candidate for the nomination of circuit judge, and for his name to appear in the Democratic column on the official ballot for the general election in November of this year, has no legal standing to contest the right of Mr. Caudill to have his name printed on the same ballot for the same office in the Republican column, although he was properly found guilty of violating the Corrupt Practices Act in seeking the right to also have his name printed in the Democratic column as a candidate for the same office at the same general election. The opinion sustaining such charges against Mr. Caudill was and is supported by the most convincing testimony, showing not only a violation of the Corrupt Practices Act by himself personally, but also that he necessarily had knowledge of its gross violation by others in his behalf and with whom he was almost daily associated at the times and places when they were distributing money to be used at the various precincts of the counties composing the judicial district. In fact, the testimony shows an utter disregard of the statute on the subject and an organized determination to buy voters on election day in the same manner and after the same fashion as one would buy articles of produce in the open market. Such practices, we have often said, cannot be too strongly condemned, and no one with the least reflection can contemplate it without grave apprehensions for the future stability of our present form of government. It was and is so viewed by our Legislature when it enacted our Corrupt Practices Act, section 11 of which (now section 1565b-11 of the 1930 Edition of Carroll's Kentucky Statutes) expressly makes such violations a ground of contest, and, if proven, the nomination in a primary election, or the certificate of election in a general one, shall be withheld from the violator. Section 1565b-4, which is section 4 of the same act, requires all candidates, both before and after the election, to make certain sworn statements as to the amount of money expended during their campaigns, and for what pur-

poses expended; while other sections limit the amount that may be expended for any purpose.

Until the act of March 23, 1920 (which was chapter 99, page 513, of the session acts of that year and now a portion of section 1550-6 of the same edition of the Kentucky Statutes), candidates for circuit judges and judges of the Court of Appeals were compelled to seek their nominations in *party* primary elections only, under the emblem of one political party, or to become an independent candidate on the official ballot for the regular election, and under the law as it existed before the 1920 act a candidate for either of such offices could not in any manner have his name printed in any column on the official ballot for the regular election except in the column of the party that nominated him (and only one of them could do so), or by petition as an independent candidate; but no nominated candidate could become an independent one so as to have his name printed on the official ballot for the regular election in both an independent column and also in the one of the party that nominated him. However, the 1920 act worked a radical change in such particulars, since it expressly provided that any one with the requisite qualifications might be nominated or voted for in a primary election, as a candidate in the following general election by as many political parties as are entitled to a place on the official ballot for the general election, or in as many columns as might be printed on that ballot as the individual offering himself as a candidate sought to obtain by petition.

In other words, that statute took the nominations of such judicial positions entirely out of political parties so as to enable all parties and groups of independent citizens to designate the same individual to be voted for the same office under their respective emblems. That (1920) act contains for the first time as a part of our statutory law this language: "Before any successful candidates for such judicial nomination or *nominations* shall be given his certificate or *certificates* of nomination, he shall file with the clerk of the county court, in which he resides, a statement that during the campaign for the said nomination *or nominations* he did not, and while a candidate for the said office will not knowingly violate any election law or any law defining or relating to corrupt and fraudulent practice in cam-

paigns or elections in this State, and if elected will qualify for said office.'' (Our italics.)

It will be noticed that it expressly withholds the right of one seeking election to either of such judicial positions to obtain his certificate or ''certificates'' of nomination or ''nominations,'' unless he makes the prima facie showing that he has not violated ''any law defining or relating to corrupt and fraudulent practices in campaigns or elections in this state.'' The clear implication is that one who is a candidate for either of such judicial positions, and who seeks the nomination of either *one* or *more* parties, shall have no certificate as the nominee of *any* of such parties if during the campaign for the office he has been guilty of such violations. Surely, the Legislature meant to accomplish some purpose by the enactment of the inserted excerpt. That purpose could not be to make such judicial aspirants amenable to the Corrupt Practices Act, above referred to, since its provisions already applied to them.

The statute plainly manifests the policy of the Legislature to purge the name of any candidate for any nomination for either judicial office from *any* place on the official ballot to be voted at the following general election, and it is hardly possible that it intended and contemplated that no one should have the right to enforce such eminently proper declared policy. If an opposing candidate for the same office having acquired the right to have his name printed anywhere on the official ballot for the general election may not enforce that policy, then certainly no one else can, and the result would be, not only the anomalous situation hereinafter referred to, but also to convict the Legislature of attempting a vain thing. Hence, it is my conclusion that its purpose in employing the language supra was to enable one who sought the nomination of *any* party as a candidate for circuit or appellate judge, and to thereby obtain the right to have his name printed under its emblem on the official ballot for the general election, to contest that of another who also sought to have his name on the same official ballot for the general election (either in the same or any other column) to have his name so printed as the nominee of any political party having a list of candidates under its emblem to be voted for at the following general election, or to be voted for as an independent candidate.

It will be observed that the inserted language of the statute withholds any certificate, "or certificates" of any nomination, "or nominations" in such judicial primary elections, and, surely, the Legislature did not intend that such declared purpose could be unheeded and no one have the right to enforce it. The case is altogether different from one where candidates can seek but one party nomination and are forbidden to seek another, being expressly confined to the right of having their names printed in only one column on the official ballot for the general election. The effect of the majority opinion is to produce a situation bordering on the ludicrous, and which is so extremely so as to demonstrate that the Legislature never intended it should happen. That situation is: That the court has found that Mr. Caudill by violating the Corrupt Practices Act in the purchasing of votes for himself has so corrupted himself personally as to become unfit to be a Democratic candidate for circuit judge of his district; but that such unfitness does not disqualify him from becoming a Republican candidate for the same office, or if it does that there is no remedy to prevent it. If he should be elected at the general election, he will still remain the same individual who, because of his corrupt practices, was unfit to be voted for as a candidate in another column or columns, and if elected he would have to perform his duties in a manner to "not let his right hand know what his left hand doeth," since it is scarcely thought that such process can have the unleavening effect of removing such judicially determined impurities.

It is my interpretation that the Legislature intended to forestall any such situation by disqualifying candidates for such positions from either their certificate or *certificates* of election, or their nomination or *nominations* as candidates for such offices, and, by unerring implication, it vested any opposing candidate for the same office at the general election with the right to enforce the inserted excerpt by contesting all nominations of his opponent. I am convinced that the views herein expressed are sustainable under well-settled rules and principles for the interpretations of statutes, and which are well known to members of the profession, and which are frequently and continuously adopted and applied by courts. But, since this is only a dissenting

opinion, and since I intend only in writing it to state generally my views, I will not lengthen it by elaboration.

For the reasons stated I most respectfully dissent from that part of the majority opinion herein last discussed, and I am authorized to say that Justices Richardson and Perry join me therein.