# Conway v. Arnold.
#### (Decided Oct. 12, 1937.)

FRANCIS M. BURKE for appellant.

J. J. MOORE and HENRY J. SCOTT for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The appellant, Roy Conway, contests the nomination of Mrs. Bessie Riddle Arnold as the Democratic

candidate for county court clerk of Pike county at the August, 1937, primary. The contestee received 5,735 votes and contestant 3,259. Two other candidates received fewer votes. Mrs. Arnold had a clear majority over all candidates of 1,491 and a plurality of 2,476 over the contestant. The contest was based exclusively on allegations of the violation of the Corrupt Practice Act (section 1565b-1 et seq., Statutes) by the contestee and others in her behalf with her authority, knowledge, and acquiescence. The circuit court dismissed the petition, and the contestant brings the case here for review.

Much of the voluminous record establishes nothing more than an industrious but unsuccessful effort to prove the grounds of the contest. Other parts of it establish the voluntary work of friends of the contestee and also of the hire of automobiles and others by the contestee, her husband and father for the distribution of campaign literature and the getting out of her vote. Whether or not the circumstances proved agency or acquiescence, as the appellant maintains, or absence of authority and ignorance by the candidate, and only voluntary personal expenditure by her husband and father, as she and her father testified, is not material, for the evidence relating to these employments and activities reflect only legitimate expenditures. Prewitt v. Caudill, 250 Ky. 698, 63 S. W. (2d) 954.

Suspicion attaches to the fact that some of the payments made by the contestee's husband and father were in $1 bills, and in one or two instances perhaps were very liberal for the declared purposes. But there is no proof tending to show an improper use by the recipients in behalf of the contestee. There is other evidence of the activities of election day workers who were not only supporting the contestee but several other candidates in the primary. Some of these men pooled their interests with others and bought votes that day, but there is no evidence of any connection with the contestee or any sort of authority or knowledge on her part of what these men did.

M. J. Jones testified that on the morning of election day the contestee's husband came to his precinct and gave him $20 or $25; and later in the day her father came there and gave him $10 or $12.00. He used the money in getting out the vote and working for her. He had several others working for contestee there, although he was particularly interested in one of the candidates

for jailer. The money was in $1 bills. Another witness testified that Jones furnished the voters with sample ballots marked for Mrs. Arnold and other candidates, and that he saw him pay money to 25 or 30 voters. But the witness could give the name of no voter whom he saw thus paid. Arnold did not testify, but the appellee and her father testified they knew nothing about any purpose of Jones to use money in an improper or illegal manner in her behalf.

Kenneth Adkins, a candidate for magistrate, had a campaign committee which raised $680 for him. The contestee's husband gave that committee $200. He is vice president of a bank in Pikeville. The treasurer of this committee testified he had reluctantly accepted this money because he was supporting Conway, the contestant, in the county clerk's race. However, he had finally consented to take it in order that it could not be used for Mrs. Arnold against her opponent, the contestant, or against his candidate for magistrate. The manner in which this money was spent was not developed, except it was used in connection with Adkins' race.

Bud Wiley received $15 from Mr. Arnold which he used in his precinct. The money was a $5 bill and the balance in twos and ones. All the admissions obtained from Wiley were that he supported other candidates and used the money for Mrs. Arnold "in a way; some ways." There may be a suspicion but no proof of an illegal or improper use of this money.

Layne Justice testified to having received $100 from contestee's husband and a like amount from Lawrence Branham, a candidate for jailer. He spent $20 of the money in the Island Creek precinct, but did nothing there for Mrs. Arnold except to vote for her. After the election, he returned $100 to Branham. There is testimony that this man, with others, got together on a slate or ticket, pooled their money, and bribed voters. The election seems to have been held in the open on the side of the highway. On the other hand, some of those mentioned in connection with this pool denied any special activity and all say the only thing they did for the contestee was to vote for her and in a few instances to mark sample ballots in her favor. Sherm Ray, identified as treasurer of this group, testified that he believed Justice gave him $30, and that he gave voters from 25 cents to a dollar after they had voted and because they wanted

money with which to buy liquor. It was not given to influence them. He specifically denied asking those persons to vote for Mrs. Arnold, although he may have told them to do so. Justice denied giving Ray any money.

J. E. Sanders, a candidate for county attorney, testified that he and the contestee's husband had agreed to have a talk before the election. He came in from campaigning one night and saw Mrs. Arnold on the street. He asked if her husband was around and she replied that she did not know but would find out. She later informed him he was in the bank. At this conference, and at others, Sanders and Arnold discussed the use of money in the campaign, and went over the situation in the county. About 5 o'clock on the morning of election day, Sanders went to the Arnold home. Mrs. Arnold's father answered the door. He went upstairs and found Mr. Arnold in a room alone and asleep. He awakened him and told him what he wanted. Mrs. Arnold was not present. When he came out, she was in the hall. However, as the result of this conversation, Arnold gave him a slip of paper on which he wrote: "Layne, o. k.—K. L. A." This memorandum was handed to him in the hall in the presence of Mrs. Arnold, but it is not shown she knew what it was. Before this, Arnold had advised Sanders that "his money was going to be in the hands of Layne Justice of Island Creek."

Sanders was having trouble getting Justice to make a fight for him in his race and had decided to go up in that precinct on election day. That morning in the Arnold home, after he had obtained the cryptic memorandum, he and Arnold talked about where each was going and Arnold said, "They had a mix-up at Dorton and he was going up there to see about that." The witness remarked that the mix-up there was caused by his placing money in the wrong person's hands. This part of their conversation, he testified, was in the presence of the contestee. But is this statement by Sanders proof of her guilt? Layne Justice denied having had any connection or association with Sanders except to warn him several times against looking into the booths while voters were in them.

The suspicious circumstances may indicate there was an agreement to violate the Corrupt Practice Act by these two men. That is all. If assumptions are to be indulged, the more logical one is that Sanders was

visiting Mr. Arnold, seeking aid in his own race rather than to secure authority to represent Mrs. Arnold in illegal and corrupt practices. Mrs. Arnold denied that she was present on this occasion and denied that she saw or knew of her husband giving Sanders the memorandum. She saw him when he passed her door starting down the stairs and spoke to him. In response to his question, she told Sanders that she was going to Pond Creek that day. No claim was made that she was present at any other of the conferences which Sanders had with Arnold or that she knew anything about their arrangements. Mrs. Arnold testified that she knew Sanders was against her and would not permit her husband to enter into any arrangement with him. She denied knowledge of any of his activities.

The contestee was asked specifically as to each instance where the contestant had shown money had been received from her husband or father. She expressly denied having authorized either of them to spend any money in her behalf, as well as having any knowledge that they did so. She had no purpose and made no promise to repay them whatever they might have spent. It is to be noted that, except the circumstances which occurred in her home in the early morning of election day, no notice or knowledge or circumstance from which knowledge could be inferred were established. There is only the relationship.

Stress is laid on the development that Mrs. Arnold had not made a very active personal canvass of the county and yet had received such a large vote. This result, it is argued, manifests use of money in her behalf. She was not idle but had not undertaken to cover the county. She had considerable advertising and campaign literature and many friends and relatives at work for her, as the evidence discloses. She had served for a number of years as a deputy under both Republican and Democratic county clerks and one term as county clerk. Her previous election was by a substantial majority in a field of ten, including the contestant. For several years she had been active in party politics. She campaigned generally with people everywhere and with many who came to her office. A popular official in such a strategic place for contacting voters has a great advantage over one not so fortunately situated. The fact of her large majority is not proof of the violation of the law by her in order to obtain the nomination.

Mrs. Arnold admitted talking to her husband about her race, but denied that there was any arrangement by which he was to assume any special activity in her behalf. Her husband was not offered as a witness. It is said in appellant's brief that he absented himself to avoid testifying, and the response is made that he was present a good part of the time during which appellant was taking his proof and was not called. Mrs. Arnold testified that he had gone to Washington and New York on business. His failure to testify is also excused by counsel upon the ground of incompetency. The contestee's father, T. M. Riddle, in relation to the particular incriminating testimony outlined above, testified that his daughter knew nothing about his hiring of men and machines in her behalf. He had been solicited by those men whom he employed and accepted their offers on his own initiative and at his own expense. He had not taken an active part in politics for many years.

In recapitulation of the record tending to establish the violation of the Corrupt Practice Act by and on behalf of the contestee, we have the testimony that her father and husband gave $30 or $40 in small denominations to Jones, and of one witness that Jones was buying votes. But he was particularly interested in the jailer's race, although he had others working at the polls for Mrs. Arnold and marked some ballots for her. Jones denies any wrongful use of money for contestee. We have the evidence that her husband gave $100 to Layne Justice, who, too, was especially interested in the jailer's race; and in her presence sent him a memorandum vouching for a candidate for county attorney. The money which Justice had was put in a pool for a number of candidates and there is evidence that it was used to corrupt voters. But the parties involved denied having done anything at all for the contestee except to vote for her. The contestee knew there was a conference the night before and another early in the morning of election day between Sanders and her husband, but their arrangement was not disclosed. Whatever it was, the contestee is not shown to have had any knowledge of it. Over against this evidence are the denials of the contestee of any knowledge of any of these suspicious things, and her denial of any authority of her husband or father to act in her behalf. This denial is supported by the testimony of her father. If it should be held that the relationship of the husband and father was suf-

ficient to infer agency, still specific proof of any violation of the law by them is not presented in the record.

We are of opinion that the contestant failed to establish his case.

The judgment is accordingly affirmed.

Whole court sitting except Chief Justice Ratliff.