# Howard v. Whittaker.

(Decided Oct. 24, 1933.)

A. F. BYRD and A. H. ALLEN for appellant.

E. B. ARNETT, EARL R. COOPER and H. H. RAMEY for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

At the November election, 1931, Grover Howard, Ramey Whittaker, Taylor Bradley, W. M. Hale, Roy Wireman, Dora Howard, Dave Wireman, Boyd Miller, and Tommy Fletcher were candidates for membership of the county board of education of educational division No. 3, composed of voting precincts 8, 9, 11, and 18 of Breathitt county. W. M. Hale and Boyd Miller withdrew from the race after their names had been printed on the ballots to be used in the election. The election commissioners of the county certified that Grover Howard had received 278 votes; Taylor Bradley 2; W. H. Hale 2; Roy Wireman 116; Dora Howard 41; Dave Wireman 2; Boyd Miller 0; Tommy Fletcher 3; H. C. Montgomery 1; and Whittaker 690 in the four voting precincts. Within the time fixed by statute (section 1596a-12, Ky. Stats. Supp. 1933), Grover Howard brought this action contesting the election of Ramey Whittaker, to whom the election commissioners had issued and delivered a certificate of election. Numerous grounds are set up in the petition, one of which is that Whitaker violated the Corrupt Practice Act (Ky. Stats. sec. 1565b-1 et seq.) by the bribing of voters. Whittaker responded to Howard's petition, traversing its allegations and also containing counter grounds of contest. The parties abandoned all grounds of contest, except Howard's charge that Whittaker had violated the Corrupt Practice Act. The court on hearing the evidence dismissed the petition; hence this appeal.

The questions presented for determination are mixed questions of law and fact. A disposition of them requires a review of the evidence.

It is substantially proven that W. H. Hale, who was a candidate for membership on the board in the educational division, withdrew from the race on Sunday night before the election, and on Monday before the election he engaged in traveling over the precincts notifying the voters of his withdrawal. On Sunday night Jolly Arnett and W. M. Hale went from Royalton, where Hale lived, in an automobile to Salyersville, to the office of the county superintendent, and also to the office of an attorney in Salyersville. Jolly Arnett informed Hale that he wanted him to withdraw, that he was due a school for some of his children to teach, and that he would help him get a school for some of them. At that time he owed Jolly Arnett a note for $80, se-

cured by a mortgage on real estate. They then returned from Salyersville; Hale going to his home. About midnight on Sunday Arnett went to Hale's home and offered to donate the note and mortgage to him if he would definitely decide to withdraw from the race. Next morning Hale claims that he decided to announce his withdrawal. Hale was asked if Arnett promised him a school for one of his children if he would withdraw from the race. His response to the question was, "I don't think he did." He also stated that Ramey Whittaker asked him to quit the race.

It is appropriate to remark here that Jolly Arnett claims that Hale was interested in a threatened or pending prosecution against a friend or relative of his, and that the note and mortgage was surrendered to Hale to induce him to consent to a compromise of the prosecution. Hale denies in toto the statements of Arnett in this respect.

Bruce Patrick accompanied Arnett to the home of Hale on the night the note and mortgage were delivered to Hale.

S. Y. Allen, a teacher of the county, and Whittaker admit that he had stated to Allen, if he (Allen) would vote for and support him, he (Whittaker) would help him get a school; also told him that he and the superintendent had discussed the school at Royalton, and they needed Allen to teach it.

Robert Risener testified that Whittaker sought his support a short time before the election and informed him that, if Risener would support him and run for the office of jailer, he would contribute $50 to his race, but he did not vote in the school election.

E. G. Howard was a voter in precinct No. 11. He was a school teacher, but in order to teach he would have to undergo an examination. On the night before the election Whittaker talked with him and informed him that his (Whittaker's) wife was a teacher and that he could get the examination questions from the then county superintendent, for his and his wife's examination.

Clarence Clemmons was a driller of water wells. Whittaker talked with him about drilling wells for the school board, and promised to get him a contract to

drill, and that he made a contract with the school board to drill, and did drill one well for the board in September, 1931. At the time this conversation occurred Whittaker sought his support and vote at the election.

Goebel Stevens testified that about five days before the election Whittaker came to his home with a writing signed by himself, the county superintendent, and other members of the board of education, in which they agreed to bind themselves to build certain schoolhouses, and urged Stevens and others in the vicinity to support him.

Jimmy Shepherd testified as to the identity of the writing and its contents. Margaret Wireman was the mother of a school teacher, and testified that a few days before the election Whittaker informed her that "there was no one up there that could make a certificate without help," and that, if he was elected, Betty (her daughter) could go into the examination with his wife, and she would help her through, and that he would guarantee that Betty would make a certificate, and see that she got a school, and that he wanted her and her daughter's vote, when she informed him that she had not promised any one.

Coon Patrick was at precinct No. 18 on the day of the election. He testified that he had a fund of about $100, but he did not believe he bought more than 50 votes. On the day of the election he was working for the regular Republican ticket and Whittaker.

George Howard had a conversation with Whittaker a short time before the election, when Whittaker told him, if he would support him, and if he were elected, he would have a new district made and a new schoolhouse built. He says he voted for Whittaker.

Parrish Allen says that Whittaker a short time before the election told him if he would support him in his race he would have a new school district made. He supported Whittaker.

Similar conversations and like propositions of Whittaker are shown by the testimony of others. It is shown by the testimony of J. I. Stevens that Whittaker and his supporters, including Ashford Joseph, Burnett Howard, D. J. Carty, Branch Carty, Homer Howard, Oran Salyer, Chester Arnett, Jolly Arnett, and others,

had meetings at a church, storehouse, and other places, and discussed the getting candidates who were opposing Whittaker to withdraw, and on one occasion it was discussed that certain votes that Whittaker could "handle" could not be handled by other candidates. The withdrawing of Boyd Miller and W. M. Hale was discussed. The witness was asked and answered this question:

"Q. What was said about the possibility of spending or using money in the election? A. Well, I don't know if it was discussed, I don't know. They were in the back room, there were a bunch of them, and I could not understand what they said."

D. J. Carty, Jolly Arnett and Ashford Joseph were present at the time of this conversation.

These meetings of Whittaker and his workers were held at intervals, at different places for a period of three weeks next before the election. The examination of this witness continued:

"Q. Did you see Jolly Arnett on the day of the election with any money for the purpose of buying or influencing voters? A. Well, he gave me $8.00 that day to take to four different parties.

"Q. Who were the parties? A. Susie Wadkins, Mary Marshall, Flora Marshall and Pace Hughes. * * *

"Q. You told them that he said he would give them $2.00 before they voted? A. Yes, sir.

"Q. Who did Jolly say for them to vote for? A. For Ramey Whittaker.

"Q. You had to give some assurances that they had voted for Whittaker didn't you? A. Well, Susie Wadkins gave him a little piece of paper, but I don't know what was on the paper."

Jolly Arnett admitted in his testimony that he was more interested in Ramey's election than any one on the regular ticket. He testified that he did not spend any money for Ramey, but, if he had used it in his behalf, he would admit it. These questions were propounded to and answered by him:

"Q. How much money did you see there? A. I don't guess I used over $25.00 myself.

"Q. Did you take with you there or have there on the morning of the election or the day of the election which you say you used yourself? A. Yes, sir.

"Q. How much in all? A. I guess I had $200.00.

"Q. To whom did you distribute the remainder of the $200.00 other than the $25.00 you say you may have used; to be used there on the day of the election? * * * A. I didn't distribute it to anybody.

"Q. What became of the rest of the $200.00? A. I brought it back home with me and put some of it in the bank a little later.

"Q. If you were more interested for Ramey Whittaker than for other candidates, why was it you spent money for other candidates and none for Ramey? A. Well, I was interested in the race and I didn't want to spend any money for him to influence voters, on account of a contest.

"Q. What did you mean when you said you didn't want to be using money for Whittaker on account of a contest? A. I mean in the future, if there was a contest they might throw him out of his office, if it was proven there was any money spent.

"Q. Was the defendant, Ramey Whittaker, at your house some little time before the election on a night when there were a number of teachers in the Royalton school there at your house? A. I believe he was, I don't recall how long before the election he was there.

"Q. The money that you took to Royalton, or had at Royalton on the day of the election, where did you get it? A. Well, I got a little money out of the bank.

"Q. Was that your money? A. Yes sir, it was.

"Q. Did you have other money besides what you got out of the bank on election day? A. Yes, sir.

"Q. How much? A. Well, I had about $500 that I borrowed of another party.

"Q. Did you give him a note and mortgage for it? A. I guess I made it good.

"Q. When did you get that from Harry Ramey? * * * A. Not over four or five days, maybe not that long. I guess it was 3 or 4 days.

"Q. Was it on the same night that you came to town here with Mr. Hale? A. I don't know.

"Q. Well, you say that it is not? A. I don't think so, I am not positive.

"Q. Did you get money or a check? A. I got the money. * * *

"Q. Was that money in small bills? A. Well, $5.00 and $10.00 I believe.

"Q. Did you get that to use in the election? A. Well I got it, I thought I might want to use it in the election.

"Q. In what race or races? A. Well, I thought I might want to spend it for the Democratic Party.

"Q. Were you interested enough in the Democratic Party to spend $500.00 up there in your precinct? A. Not at that time.

"Q. Is that what you got the money for? A. I got it, I thought I might want to spend it in the election, but didn't.

"Q. What did you do with it? A. I paid off a note with the biggest part of it.

"Q. What is the amount of the note you paid off to the bank here? A. I think the note was $525.00, it was in two notes.

"Q. You didn't pay all of that with that $500 did you? A. No sir.

"Q. You stated awhile ago that you used a part of the $500 that you got of Mr. Ramey to pay on the note to the bank for Wilbur Howard. How much of that money did you use in paying the note to the bank? A. I could not tell, I could not say now.

"Q. I am trying to find out and test your recollection as to how much you paid on the Wilbur Howard note to the bank? A. I guess something like $200 or $300 I don't remember.

"Q. Did you deposit that money that you got from Harry Ramey in the bank. A. No sir.

"Q. Did you redeposit any of that $200 or whatever amount it happened to be which you drew out of the bank? A. Yes sir, I deposited some of it.

"Q. How much? A. I don't remember how much, I deposited some of it and gave my brother $50.00.

"Q. What is his name? A. Greely Arnett.

* * *

"Q. How much did you give him? A. I gave him $50.00.

"Q. For what purpose did you give it to him? A. Well I believe he was interested in a school race, and I let him have it."

Susie Wadkins and Arthur Marshall's wife went together to the election. We will hereafter consider the testimony of Susie Wadkins.

Troy Harmon testified that he voted for Ramey Whittaker; that Homer Howard paid him $3 and directed him to go and vote for Ramey, and for anybody body else he pleased.

Garfield Fletcher testified that Jolly Arnett asked him to vote for Whittaker, and told him that he would pay him $3 to stay downstairs and not go up where they were voting. Homer Howard came to see him and the witness and Homer and Jolly Arnett were talking together, when Jolly Arnett said to Homer that he had told Fletcher that he would give him $3 if he would not go up until late in the evening, when Homer spoke up and says, the money is just about gone, and Jolly says, "It don't make any difference," and directed Homer to give him the $3 which he did.

Alex Fletcher testified that Homer Howard paid him $2 to vote for Ramey Whittaker and he voted for him. Tollie Fletcher also testified that Homer Howard paid him $3 to vote for Ramey, and he voted for him. Homer Howard admitted that he was at the November election and spent a few dollars of his own money, and that he bought Alex Fletcher and Troy Harmon for the Republican ticket. He stated that he was for Ramey Whittaker and that he was himself a Democrat.

A number of witnesses testified that Boyd Miller was on the election ground in his precinct, exhibiting a roll of money. He worked for Whittaker. Charlie Howard testified that he saw Boyd Miller give money to voters and the voters would go into the voting place with Miller. Arthur Marshall testified that Jolly Arnett gave him $8 to pay to Susie Wadkins and three other women on that day, and directed him to pay them $2 each before they voted, and to tell them to vote for Whittaker, which he did.

Mollie Carty testified that she saw Jolly Arnett give Dixon Pinks some money. Jolly admitted he gave him $2. George Marshall claims he saw $2 paid to some one whose name he could not give to vote for Whittaker. Wallace Collins was paid $4 by Jolly Arnett to vote for Whittaker. Bruce Stevens was present on the election grounds when Ashford Joseph gave some money to another man whose name he thought was Workman. Andrew Allen says that he was paid by Jolly Arnett $2 to vote for Whittaker.

It is fair to say that in his deposition Whittaker categorically denied any knowledge of these expenditures of money in his behalf. Jolly Arnett in the same manner declared that Whittaker had no knowledge of his possession or use of money. Boyd Miller claimed he had no money, and he did not spend money at the election.

It is most vigorously and earnestly urged that the testimony of the witnesses concerning the acts, conduct, and statements of Whittaker, before the day of the election, are not within the purview of the Corrupt Practice Act. Conceding, without deciding, the correctness of this insistence, such evidence at least tends to show the state of mind, the intent, motive, and willingness of Whittaker to resort to questionable practices to win his election. It is a familiar rule that, on the trial of a criminal case, evidence that the accused had committed other offenses than that for which he is being tried is incompetent, but to this rule there are certain exceptions, one of which is, the commission of other crimes by the accused may be shown for the purpose of establishing identity, motive, intent, guilty knowledge, plan, scheme, or system. Morse v. Com., 129 Ky. 294, 111 S. W. 714, 33 Ky. Law Rep, 831, 894; Sneed v. Com.,

236 Ky. 838, 34 S. W. (2d) 724. Although the acts engaged in by, and the statements of, Whittaker, before the day of the election, and not at the polls, as they are shown by the evidence, may not technically fall within the Corrupt Practice Act, yet evidence establishing the same is competent for the purpose of showing his intent, motive, and willingness to engage, by himself and through others acting in his interests, in acts prohibited by the act.

The bribing of voters in the interest of Whittaker is admitted by those (except Jolly Arnett) who actually engaged in the crime on the day of the election. On the morning of the election, Whittaker and his wife went to the voting place in their precinct, and voted. He remained during the day in this precinct, working in behalf of his candidacy, and she went to Royalton precinct. As to her going to Royalton precinct, he was asked and answered:

"Q. Did you know she was going to the Royalton precinct? A. Yes sir, she said she was.

"Q. Was she not going there in the interest of your candidacy? A. Yes sir, she said she was.

"Q. Did you approve of her going there? A. Yes sir."

Susie Wadkins was a voter in Royalton precinct, and narrates a conversation occurring on the election ground between her and Mrs. Whittaker. It discloses the scheme used in this precinct and the parties participating in it, thus: "Ramey Whittaker's wife asked me to vote for Ramey; she said, 'You stand here until I come back,' and she said to me, 'we are giving $2.00 apiece,' and she said she wanted me to go in and vote, and she gave me a paper to give to Ashford Joseph. He was standing by there. I gave him that paper and went in and voted, I voted the straight Republican ticket and for Ramey Whittaker. When I started out Ashford Joseph gave me back the paper. He turned his back to the folks up there and wrote a name on a piece of paper. I could not tell what he wrote. I took the paper back and gave it to Ramey Whittaker's wife, and she stated that Jolly Arnett would do the paying, and Jolly Arnett told me that he would pay it to Arthur Marshall, and that Arthur would pay it to me. I got the $2.00 from Arthur Marshall after I voted. Jolly

Arnett told Arthur Marshall to pay the Pash woman that lived with Willie Hall, and Arthur's mother and wife.''

Viewing all the proven facts and the testimony of Whittaker relative to his wife going to Royalton precinct, in the light of the conversation with Mrs. Wadkins and Mrs. Whittaker, there leaves but little doubt that the plan of buying votes was a matured one, and his remaining at Atkeson precinct and the going of his wife to Royalton was known to him to be for the purpose of her participating in the plan of bribing voters in the Royalton precinct, and at the same time furnishing Whittaker an alibi exculpating him of all responsibility for the use of money in Royalton precinct. In this connection it is proper to observe that Jolly Arnett's explanation for not expending the $200 was that its use would constitute grounds of contest. Whittaker does not deny that meetings were held at intervals over a period of three weeks next preceding the election for the purpose of promoting his candidacy, and that one of the subjects discussed at those meetings was the ''handling of voters for the benefit of Whittaker, if other candidates would withdraw,'' and that Jolly Arnett, Ashford Joseph, and others, who attended these meetings and engaged in the discussions, were on the election ground on the day of the election, in possession of money, and actually engaged in buying votes in behalf of Whittaker. He merely denies having actual knowledge of Arnett's possession of money and paying ing it to voters to influence them to vote for him. Jolly Arnett and Ashford Joseph by the ticket system were causing voters by bribery to vote for Whittaker, and his wife, who had just left him in another precinct, on her arrival at Royalton began to inform the voters, ''We are giving $2.00 apiece,'' and immediately furnished a ticket to a voter to be passed to a worker and by him to another worker, the purpose of the ticket being to identify the voter to be paid by the paymaster. Ashford Joseph, who was a regular attendant of Whittaker's meetings held before the election, received the ticket as the voter went to vote, and returned the ticket to the voter after she had voted for Whittaker, with somehing written on it, which was in turn delivered to the paymaster. Whittaker nowhere denies that he did not have knowledge of the existence of this scheme used

in the bribing of voters as it is described by the evidence. He admits that he had experience as a candidate at a previous election and also that he had arranged with Jolly Arnett and his wife to go to Royalton precinct to work there among the voters.

It is common knowledge that those who originate or design a plan by which voters are to be corrupted at an election do so clandestinely and do not voluntarily admit the existence and use of the scheme resorted to for that purpose, even when direct questions are propounded to them to elicit from them the truth. Neither Jolly Arnett nor Whittaker deny the use of the plan of bribing and paying voters in the Royalton precinct; nor does any other witness.

Evidence of the actions, conduct of the workers, their private meetings with the candidate, their association with, and their kinship or relations to, him, and their reputations prior to the elections involved in the contest, of engaging in corrupt practices to win elections, as well as their conduct on the day of the particular election, and also evidence of the actions and conduct of the candidate before and on the day of the election, and his reputation prior to the election in contest, of engaging in such practices, is competent and relevant when determining whether or not the candidate had knowledge of the bribing of voters by the workers in his behalf, although he is shown not to have been present on the election ground where the offense was committed.

Wigmore on Evidence, vol. 1, sec. 245, p. 305, states the general, applicable principle thus: "There are, in a broad analysis, four kinds of circumstances (events or things) which may point forward to the probability that a given person received a given impression (i. e. obtained knowledge, formed a belief, or was made conscious): (1) The direct exposure of the fact to his sense of sight, hearing or the like; (2) the express making of a communication to him; (3) the reputation in the community on the subject, as leading probably to an express communication; (4) the quality of the occurrence as leading either to the actual perception by his senses, or to express communication."

The sporadic, spontaneous spending of money by ardent, overzealous friends, relatives, or partisans of a

candidate, to bribe or corruptly influence voters to vote for him, without an opportunity for him to obtain knowledge, is quite different from the expending of money for him by organized workers, according to a smooth-working scheme. An honest, complete denial of knowledge by the candidate and such supporters in the first instance may be regarded in the circumstances of a particular case as sufficient to exonerate the candidate of all liability therefor, especially when he is not present on the election ground where the illegal practices are engaged in. A different rule must be applied in the latter case.

The purpose of the Corrupt Practice Act requiring knowledge of its violation on the part of the candidate is that a guilty candidate may be punished, and the innocent one protected. If this had not been the intention of the act, the liability of the candidate for bribery by his friends, relatives, and partisans, in his interest, would have been made absolute, and not to depend on the knowledge of the candidate: Utley v. Hill, 155 Mo. 232, 55 S. W. 1091, 49 L. R. A. 323, 78 Am. St. Rep. 569.

To deprive a candidate of his nomination or election on a charge of the violation of the Corrupt Practice Act, it is essential and necessary to establish that (a) the act has been violated in his interest, and that (b) he had knowledge thereof within the meaning of the term knowledge in its popular sense.

"Knowledge is the means of mental impression; state of being aware." See Wigmore on Evidence, sections 244, 245, and 300, for an elaborate statement of the general principles. It is that which is given by information or intelligence, and is not confined to what is personally observed. Davenport v. Prentice, 126 App. Div. 451, 110 N. Y. S. 1056.

In Parrish v. Com., 136 Ky. 77 123 S. W. 339, 346, the accused was charged with a statutory offense of receiving a deposit, knowing the bank to be insolvent. Therein the court defined the word "knowledge," thus: "The word 'knowledge' has no technical meaning. * * * It is a word in popular use, and its import is well understood. Knowledge may be obtained from many sources and in many ways, and is furnished or generally speaking, when we say that a person has

knowledge of an existing condition [or act], we mean obtained by a variety of facts and circumstances. But, that his relation to it, his association with it, his control over it, his direction of it are such as to give him actual personal information concerning it.''

''Knowledge,'' as it is applied in the Corrupt Practice Act, may be proven (a) by showing the candidate committed, consented to, or authorized others to commit, or personally observed the commission by others of, an act or acts prohibited by it, or (b) it may be shown by facts and circumstances surrounding the candidate and his workers during the period of preparation for the day of the election, as well as on the day of the particular election, which, when viewed in the light of all other developed facts, may be sufficient to establish that the candidate had knowledge of the charged violations of the act. Scalf v. Pursifull, —— Ky. ——, 63 S. W. (2d) 504, decided Sept. 29, 1933.

The bribing of voters as described in the evidence, in this case, was not done for the benefit of a group of candidates or for the regular party ticket, but solely for Whittaker by his organized workers, according to a definite, matured scheme.

It is shown by the evidence that the general character of Whittaker for truth and veracity was bad. No evidence was offered to support his general character. It is argued in his brief that the evidence attacking his character was taken in rebuttal, and after his time for taking depositions had expired. It does not appear that he made application to the court for an extension of time in which to take depositions bearing on the question of his character for truth and veracity. Doubtless, if the court had been requested, time would have been extended for this purpose.

The testimony of three witnesses was taken attacking the character of Susie Wadkins. The testimony of all of the witnesses named by her as participating in the plan of buying her vote, and that of others, was not taken. Even if her character be regarded as successfully assailed, her testimony is not only corroborated by that of other witnesses, but not denied by the persons whose names she gave, and who partici-

pated in the handling of the ticket furnished her, and the paying her and others the money for voting for Whittaker.

It is suggested in his brief that the large plurality received by Whittaker shows he is a man of outstanding character, and that, because of his large plurality, the provisions of the Corrupt Practice Act should not control his right to the certificate of election.

The Corrupt Practice Act expressly declares that a nomination for, or an election to, office is void, if the candidate violates its provisions. Therefore his large plurality or majority is not controlling where it is satisfactorily shown that he has committed acts, or acts have been committed by others in his interest, with his knowledge, to secure his nomination or election, contrary to its provisions.

Every election contest must be adjudged on the facts adduced. Sifting the evidence herein with the sieve of common sense, and testing it with the general knowledge of the average layman, we are convinced that the facts and circumstances abundantly show that bribery was committed in the interest of Whittaker, with his knowledge, and that he is not entitled to the certificate of election so secured.

Reversed, with directions for judgment declaring his certificate of election void, and for proceedings consistent with this opinion.

Whole court sitting.