### Scalf v. Pursifull.

(Decided Sept. 29, 1933.)

E. N. INGRAM, J. S. GOLDEN and H. H. OWENS for appellant.

N. R. PATTERSON for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and contestant below, William D. Scalf, and the appellee and contestee below, John M. Pursifull, were rival candidates for the Republican nomination for the office of county court clerk of Bell county in the August primary election, 1933. The can-

vass of the votes cast for them by the county board of election commissioners showed that contestee received 3,450 and the contestant 2,368 votes, thus nominating the contestee by a majority of 1,082 votes. In due time the contestant instituted this contest proceeding in the Bell circuit court, and alleged two grounds therefor: First, irregularities in the special registration for the city of Middlesboro in Bell county, held and conducted as provided by statute some short while preceding the primary election, and at which some 900 votes were registered, some originally and some of them transferred to other voting precincts because of removal. It was contended that the alleged irregularities and defalcations with reference to that registration rendered it void and that the votes so registered and which it was alleged were all cast for contestant were illegal. The second ground of contest relied on was a charge that contestee violated the provisions of the Corrupt Practice Act (Ky. Stats. sec. 1565b-1 et seq.) by bribing electors to vote for him either personally, or through others with his knowledge and consent.

Both grounds were controverted in the answer filed by contestee; but at the trial no evidence was offered to support the first one and it was abandoned. However, testimony was taken in support of the second one followed by counter testimony introduced by contestee, and upon final submission the court dismissed the action, thereby adjudging that contestee was not guilty of the derelictions charged against him and was entitled to the nomination. To reverse that judgment, contestant prosecutes this appeal.

The object and purpose of the Legislature in enacting the Corrupt Practice Act was the commendable one of purifying elections so as to obtain an honest expression of the voters participating in them, and to free them from the corrupting influence of bribery and other impure practices, which, if persisted in, will inevitably prove to be the deadly cancer that will eventually destroy our republican form of government. Hence, it behooves the courts who are called upon to administer that act, and especially its denunciations and penalties concerning bribery, to do so unhesitatingly in a manner to carry out the purpose of the Legislature in its commendable action in making the statute the law of the land; since, as said by us in the case of Asher v. Brough-

ton, 231 Ky. 165, 21 S. W. (2d) 260, and repeated in the case of Howard v. Cockrell, 231 Ky. 278, 21 S. W. (2d) 455, 457: "No man should enjoy or profit by that which he has obtained through the violation of laws enacted to protect elections from the evil influence exerted by the bribe giver and the bribe taker. The man who bribes a voter, or suffers it to be done with his knowledge and in his interest, is not a fit person to hold public office. The law has so declared, and the sooner such persons and the public realize that such laws are to be fearlessly and sternly enforced, the sooner will bribery and corruption be numbered among the things that once were."

The difficulty with courts in their effort to follow the indicated course is encountered when it comes to the determination of the facts which, in the vast majority of cases, must be done upon the consideration of much contradictory testimony, as viewed in the light of the two propositions (also encountered in practically all the cases), first, that the one charged with such violations will never confess it, and, second, that the witnesses testifying to them are most generally the alleged purchased voters, who are frequently impeached for morality and for truth and veracity; but if not so, then the attitude they occupy as bribed voters is itself an impeachment of their integrity. Besides, under the terms of the statute the bribing of one voter is sufficient to deprive the briber of a nomination or an election, and one who will sell his vote will most generally also sell his testimony, and which conditions render it comparatively easy for a contestant to purchase the testimony of such a witness, or witnesses, from various precincts, or various witnesses of like character from the same precinct. It is seldom that the individual transaction of bribing the voter is fortified by the testimony of additional witnesses, but if it should be otherwise, it is generally done by other voters equally guilty of selling their votes. Moreover, the rule is firmly established in this and other jurisdictions that in the absence of a statutory provision, otherwise prescribing, a candidate for office is not chargeable with such violations as are contained in our statute for bribing acts that he did not perform personally and which were done without his knowledge and consent. In a large per cent. of contest cases the bribery of voters may be thoroughly established by uncontradicted testimony, but which was done

by friends of the candidate and entirely without his knowledge or consent.

We have had a number of cases before us involving all of these situations and producing such difficulties, and in which we have adopted the rule, which we hereby expressly repeat and approve, that each case must be determined on its own facts and from the picture presented by the particular record. In determining whether or not bribery alleged to have been committed by the candidate in person when supported by testimony of a witness or witnesses is established, though contradicted by the candidate, the issue necessarily has to be determined from the circumstances as they are detailed so as to ascertain which set of witnesses, in the light of their environment, are telling the truth. Therefore, the personal interest of the candidate will be taken into consideration, as well as the character of the witnesses testifying against him, plus the convincing force of their testimony, and other facts and circumstances affecting its credibility. The same rule applies in determining the issue as to whether the candidate possessed knowledge of well-established bribery committed by his friends on election day, including whether or not he was a party to any prior arrangement or understanding whereby such illegal influences should be employed in his behalf on election day. Necessarily in arriving at the facts, in the light of the considerations mentioned, a simple denial by the candidate of bribery committed by himself, or of his knowledge of that committed by others in his behalf, is not conclusive; nor is the testimony to establish bribery to be universally accepted at its face value, and all of which emphasizes the importance of, and necessity for, the guiding rule, supra, i. e., that each case must depend upon its own developments as to what are the true facts.

Some courts in referring to the knowledge by the candidate of bribery committed by his friends and supporters denominate it "imputed" knowledge, but which term is not an apt designation, since such knowledge of the candidate is *actual* and not *imputed,* and which the courts find to be established from the convincing facts and circumstances of the case, notwithstanding the candidate's denial.

In the light of these considerations we will briefly refer to the testimony offered by the contestant in sup-

port of the only ground he relied on at the trial—that of violations of our Corrupt Practice Act. One Henry Bailey was introduced by contestant who had known contestee for a number of years, and he testified that on the day before the primary election he went to the office of Pursifull for the purpose of obtaining from him a small amount of money with which to buy medicine for a member of his family. His sister-in-law was with him, and the witness testified: "I told John Matt I wanted a little help, she (his sister-in-law) was by, he said, how much do you want, I said I need a whole lot, he ran his hand in his pocket and gave me $2.00, he said you are a friend to me, I said, yes, I said I always was, I said we all are, me and my father and all, he gave me $2.00, he said, now listen, I want you to help me out and vote for me, and my sister in law was standing there, he gave her one dollar and told her the same thing."

The accompanying sister-in-law also requested a small donation for a similar purpose and which is admitted by them and contradicted by no one. It furthermore appears on their cross-examination, as well as fortified by the testimony of the contestee, that for a number of years the latter had been a friend of the Baileys, and had donated to their meager but numerous wants small sums of money from time to time. At the death of the father some six or eight years ago, he advanced $10 to aid in meeting the expenses of the funeral, and when the brother of the witness, Bailey, was accidentally killed some month or two before the primary election, he did the same thing. Therefore, when the request was made, at the time indicated by the witnesses, he called their attention to the fact that he had been a friend of theirs and was a candidate and wanted their support. He practically admitted the conversation and stated that he had no purpose in advancing the small sums to the witnesses to influence their votes, but was only continuing the helping course towards them that he had practiced for years before. Measuring this testimony by the rules, supra, we are forced to the conclusion that the court was correct in determining that it was insufficient to establish appellee's guilt.

Sam Brock was introduced by contestant, and he testified that some four or five days before the primary election he met the contestee on the streets of Pineville

452

at about 10:30 a. m., when, after the usual greetings, witness said: "I asked him for $2.00," and that appellee gave that amount to him and after it was done called his attention to the fact of his candidacy and requested witness to support him. The witness also testified that he did not obtain the $2 for the sale of his vote, since he had already fully made up his mind to support Pursifull, and that he (witness) never sold his vote. The tesitmony of this witness was denied in toto by contestee, and we are not prepared to hold that it constituted bribery within the contemplation of the statute, even if such denial had not been made.

Anna May Gambrel, a married woman, resided on an adjoining lot upon which contestee and his mother resided. The latter appears to have possessed a sympathetic and charitable disposition. Mrs. Gambrel had a young child, and was devoid of even household necessities. Some time preceding the primary election (the date not being shown, but shortly after witness moved into that house), the mother carried some old quilts and an old mattress over to the home of Mrs. Gambrel for her family use; and she also sent, or took, for the use of the baby (and also perhaps for the use of other members of the family) some articles of food to the Gambrel home, including "some cherry dumplings," especially for the baby. Upon the occasion of the delivery of the cherry dumplings, witness stated that contestee's mother called her attention to the fact that her son was a candidate for county court clerk and requested Mrs. Gambrel to support him at the election, and then added: "If you will vote for John Mat I will give you $3.00." Witness testified that she did not vote in the election at all because she was not registered and also stated that she never received the $3 or any other sum. Unfortunately for contestee, his mother, not knowing that there would be an occasion for her to testify, remained in the courtroom, and when she was offered to testify concerning the testimony of that witness, as to the alleged offer of bribery, the court upon objection declined to permit her to do so because she had remained in the courthouse during the trial. Of course, contestee testified that he knew nothing of such alleged offer by his mother. Surely it would be an extreme stretch of the intent and purpose of the statute to find and adjudge contestee liable for its violation upon the testimony of Mrs. Gambrel, since

the only ground upon which such a conclusion could be predicated would be: (a) That the mother, with contestee's knowledge and consent, bribed Mrs. Gambrel to vote for her son (but which she did not, since the witness did not vote in the election) with the latter's knowledge and consent; or (b) that he himself did so. There is no pretense to support the latter, and the evidence introduced falls far short of supporting the former.

One Charlie Stanley testified in behalf of contestant, and stated that he resided in Ferndale voting precinct in the county some distance from Pineville, and that some two or three days before the primary election he "thumbed" a ride to Pineville for the purpose of consulting a physician, but for what, and for whose ailment, he did not state. He also failed to state that he even visited any physician. But while in Pineville on that occasion he was "hanging around" appellant's office in the courthouse, and that while he was so hanging in that circling movement he chanced to look into the office of contestee and saw him hand to four persons small amounts of money ranging from $1 to $4, and to a lady who was present "a nickel or a dime," but for what purpose witness knew not, and he never learned; nor did he hear or testify to any conversation with reference to the election, or the casting of votes. Witness was unable apparently to describe any of the persons, none of whom he knew, except "a big colored fellow, looked like a business kind of a fellow. He gave him one dollar, he had a big collar and tie on and a pretty good suit of clothes." Witness also testified that one Alex Brooks was there with him at the time, or among the crowd to whom such alleged distributions were being made; but Alex did not appear in the case. This witness also testified before leaving the stand that while he heard nothing said between the parties to whom appellee gave the money (amounting to $1 or more), he did hear the woman who received the "nickel or dime" say that she wanted to get some castor oil. Contestee testified that he did not know Charlie Stanley and never saw him in his life until he appeared as a witness. In substance, he stated that as county court clerk in making change or for other purposes, he was frequently called upon to pay members of the public sums of money, and that preceding the election he arranged with some friends at certain precincts to have

on hand and operate automobiles for the purpose of conveying supporting voters to the polls; that he had no recollection of the occasion to which the witness, Stanley, referred, but that he was positive that no money was paid for the purpose of corruptly influencing the payees, or other voters. Under the rules, supra, announced for the arriving at the truth, we are constrained to hold that this transaction falls short of establishing violations of the provisions of the statute against bribery.

Lastly, it is contended that one Charlie Baker was engaged in purchasing votes for a group of candidates at the Ferndale voting precinct on election day, and there is evidence to establish that fact. But there is not a circumstance, nor an item of testimony, in the entire record to connect contestee with any of Baker's participations, since the record is bare of any testimony or circumstance to prove that any money that Baker possessed was furnished either directly or indirectly by Pursifull, and he denied any such knowledge or any participation therein. He showed the exact amount of money he spent in his campaign up to and including election day, and from whence he obtained it. He expressed a willingness for a search of the records of all the banks with which he did business, but no effort was made to contradict his testimony by the officers of any of those, or any other banks. The other candidates composing the group for whom Baker was alleged to be working may, possibly, have furnished the fund that he was unlawfully employing and that they had associated their names with Pursifull because of his proven popularity with a large majority of the electors of the county.

The record in this case establishes the fact that Pursifull is an upright, honorable citizen, and that his reputation as such is known and recognized by the people of his county. Furthermore, it appears that he is naturally charitably inclined and free to render financial assistance to the extent of his ability to suffering neighbors and wholly dependent people of his county whom the distressful condition of the country has rendered penniless, and that he freely gave of his means for such purposes long before the approach of the primary election. In view of these circumstances and of the incongruous, weak, and tottering condition of the testimony given by contestant's witnesses to prove this

ground of his contest, we are driven to the conclusion that their testimony is in some instances incredible, and in others, trifling and immaterial. Such condition of their testimony, with the express and supporting contradictions found in contestee's testimony, forces us to unhesitatingly conclude, with the court below, that appellee was not proven guilty of the violations of the statute relied on.

The law-abiding citizen might inquire why the actually proven (and frequently confessed) guilty bribers of voters, either with or without the knowledge of the candidate, are not apprehended and prosecuted, and which query has often suggested itself to us. The docket of this court in recent years has been largely filled with election contest cases, and in each of which it is proven that particular individuals, posing as friends of a certain candidate or group of candidates, remained at a precinct throughout the opening of the polls actively engaged in corruptly buying votes for a candidate or group of candidates; but it is rare indeed that such persons are ever indicted, or any effort made on the part of enforcement officers to arraign them before the bar of justice. If such derelictions were corrected and the proven bribers vigorously prosecuted, it would go far toward the accomplishment of the purpose of our Corrupt Practice Act, notwithstanding the evidence may be insufficient to charge the candidate with knowledge of such practice.

For the reasons stated the judgment is affirmed.