## Salyer v. Gross.

(Decided March 9, 1934.)

T. E. MOORE, Jr., and R. B. ROBERTS for appellant.
CRAFT & STANFILL for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

The appellant and appellee were the Democratic and Republican candidates, respectively, for the office of

county judge of Perry county in the November, 1933, election. In the election, Dr. Gross received 5,405 votes, Dr. Salyer 4,104 votes, and a third independent candidate 595 votes. Dr. Gross was awarded the certificate of election, and Dr. Salyer thereafter instituted this contest proceeding. Dr. Salyer makes no claim to the office. He concedes that he was not elected, but he does claim that Dr. Gross' election should be set aside and a vacancy declared to exist. The contest is grounded, first, on the claim that Dr. Gross violated the Corrupt Practice Act (Ky. Stats. sec. 1565b-1 et seq.), and that it was violated by his workers with his knowledge, acquiescence, and consent; secondly, on the claim that Dr. Gross had entered into a conspiracy with the other candidates on the Republican ticket to corrupt the election, and in pursuance of said conspiracy had brought about bribery, corruption, open voting, crowding of polls, chain balloting, and many other illegal practices. After hearing, the court, presided over by a special judge, Hon. W. L. Hammond, dismissed the proceeding, and Dr Salyer has appealed.

The special judge prepared and filed a written opinion in this case which discusses and covers the issues and proof so well and so succinctly that part of it is here adopted as part of our opinion in this case. He said:

"Contestant and contestee are both men of the very highest type and standing in the medical profession, and both are men of affluence in the county. Dr. Gross is the retiring sheriff of Perry county, and has heretofore served a term as county judge. Dr. Salyer has likewise been county judge of Perry county, and both these men have a host of ardent admirers and supporters. The evidence in this case is voluminous. More than one hundred witnesses were introduced and heard orally in open court. Much of the evidence is incompetent and immaterial, and some of it is of little or no significance, and very little, if any, is conclusive. Inasmuch as every county office was contested in Perry county at the last election, and the court, having in mind the importance of the office of county judge, and the social, moral, professional, and political standing of the parties, allowed an unusual latitude in the admissibility of evidence in order to determine all the facts, circumstances, and surroundings as well as to

judge the bearing and demeanor of the witnesses to the extent of enabling it to give proper weight to each individual witness. The evidence, when sifted and narrowed down, resolves itself into only two propositions: First, did the contestee himself violate the Corrupt Practice Act either in person or by and through other persons, including his wife and sons and friends with his knowledge and consent? and, secondly, would the circumstances justify the assumption he had an imputed knowledge of such violation, if any there was?

'So far as the allegation of conspiracy is concerned, it is enough to say that there was no serious or determined effort on the part of the contestant to prove a conspiracy, and no conspiracy between Dr. Gross and the other Republican candidates was shown to have existed, and this brings the court down to the sole and only proposition of the violation of the Corrupt Practice Act. * * *

"Testimony as to the use of money directly by Dr. Gross to influence voters is confined to the evidence of Andy Williams and Black Bob Combs. Andy Williams says he saw Dr. Gross give Black Bob Combs $80 a few nights before the election, with which to bribe and buy voters at Happy precinct. Andy says that on another occasion he saw Dr. Gross give some money to an unknown man in the same neighborhood. Black Bob denies having received this money, and Dr. Gross is most emphatic in his denial of giving Black Bob, or the unknown man, any money at all. Several character witnesses were introduced, and to the court's opinion Andy Williams and Black Bob both stand impeached, and the court does not believe that Dr. Gross gave Black Bob $80 or any other sum, and further it is not believed that Dr. Salyer gave Williams $25 or any other sum, or promised him any sum of money, to swear falsely. The court further does not believe that Dr. Gross gave an unknown man mentioned by Williams any money in the presence of Williams, or at all. Dr. Gross accounts for his presence and actions while in that section of the county, and the court is unwilling to accept as true such statements made by impeached witnesses, who in the court's mind stand impeached perjurers and unworthy of belief. All the money testified to as

having been spent by Dr. Gross is fully accounted for in his expense accounts, and the court is of the opinion the contestee, as shown by the record, did not himself purchase any votes or furnish any money to any one else with which to purchase or bribe votes.''

In an effort to implicate Dr. Gross in the corruption of the election, and especially in the Hardburley and Town Mountain precincts, and perhaps one or two others, considerable testimony was introduced bearing on the alleged pernicious activities of Dr. Gross' immediate family; that is, his wife and his son, Paul. There was testimony for the appellant that on one or two occasions the witness observed Mrs. Gross contributing money to a pool or jack pot with which to bribe or buy votes. The amount so contributed by her, according to this testimony, did not amount to as much as $3 all together. This evidence is contradicted by several reputable witnesses who testified that they were with Mrs. Gross practically all day, and that, aside from buying some sandwiches, pies, and cake for some poor women and children in destitute circumstances, they did not see her spend or use any money. Mrs. Minge, who lives in Hazard, testified that prior to the election Mrs. Gross came to her home and offered her $200 to take to Lothair precinct to be used for Dr. Gross on the day of the election. Mrs. Minge testified that she declined the offer and received no money and did not work for Dr. Gross in the election. The evidence as to this offer and rejection of money is contradicted not only by Mrs. Gross but also by Miss Clara Belle Cornett, who was with Mrs. Gross at the time Mrs. Gross did go to see Mrs. Minge. Mrs. Gross testified, and is corroborated by Miss Cornett, that she endeavored to enlist Mrs. Minge's support for Dr. Gross, but did not even ask her to work for Dr. Gross on election day, much less offer to intrust her with any money for that occasion. As the special judge pointed out, Mrs. Minge was a woman of little or no influence and it is hardly conceivable that Mrs. Gross would have undertaken to have employed her as Mrs. Minge testified. The court accepted Miss Cornett's and Mrs. Gross' version of this matter and not that of Mrs. Minge. On the whole, he held that the proof failed to show any violation of the Corrupt Practice Act by Mrs. Gross, and we are of opinion that the evidence supports his finding. Even if the appellate

mind were left in doubt, it would under familiar law accept the finding of fact of the trial court who in this case had the advantage of seeing the witnesses on the stand and observing their demeanor as the case was heard orally.

As to Paul Gross, some witnesses for the appellant testify that he spent some money to bribe voters, and that he bought some by writing orders on the A. & P. Grocery Company. The money they observed passed did not amount to as much as $10 and the number of orders they claim they saw written is not indicated in the record. Gross denied that he bought any votes or wrote any orders. It was testified that he bought the votes of Dovey Fuller and Bayless Fuller. They were introduced as witnesses and denied it. The special judge said:

"These witnesses impressed the court as being above the average in looks and intelligence and entitled to credit and belief, and there is nothing in the record to the contrary."

The evidence also shows that Dr. Gross most emphatically warned the members of his family not to use any money or thing of value or to violate the law in any respect whilst working for him in the various precincts. The amounts of money spent by Mrs. Gross and Paul Gross, even if the appellant's proof be taken at its face value, was very small, and there are no facts or circumstances which would by inference bring home to Dr. Gross any knowledge of these small expenditures, or indicate that he consented or acquiesced in them. Mrs. Gross was offered as a witness but, on appellant objecting to her testifying, she was not allowed to testify. There was evidence that a few of Dr. Gross' friends in one or two precincts spent small sums of money for him. The expenditures did not amount to as much as $10 in any one case. Aside from the total lack of proof connecting Dr. Gross with these expenditures, these friends were introduced by him, and testified that they bought no votes and confined these expenditures to taxi fares, cakes, and chicken for women and children about the polls and other like innocent matters. The proof fails to establish directly or by reasonable inference that Dr. Gross knew of any of these expenditures by friends or by his family with which it is sought to invalidate his election. The court did not err in holding

that the election was not invalid on this ground. Baker v. Gross, 231 Ky. 51, 21 S. W. (2d) 138; Scalf v. Pursifull, 250 Ky. 447, 63 S. W. (2d) 504.

The evidence as to the open voting, crowding of the polls, lack of curtains about the booths, etc., while voluminous and indeed uncontradicted, was introduced in connection with the conspiracy charge. Appellant expressly agreed that the charges he made in his pleadings as to these matters went only to support his conspiracy charge, and hence it follows that, if the conspiracy charge fails, he cannot after the time has passed as it has in this case to set up additional grounds of contest rely on these matters as independent grounds of contest. Cf. Taylor v. Nuetzel, 220 Ky. 510, 295 S. W. 873. As heretofore pointed out, there simply was no evidence of a conspiracy in this record. Indeed, these matters of open voting, etc., were not even traced to Dr. Gross, directly or indirectly, so we may at once dismiss the further discussion of them.

Appellant also relies for a reversal in this case on the ground of the court's refusal to grant him further time within which to get Grant Campbell, a witness, into court to testify. There is not the slightest doubt but that Campbell evaded the processes of the court. The court granted appellant every facility to get Campbell into court, and by order provided that, whenever he did come into court, no matter at what stage of the proceedings, appellant should be entitled to put him on the stand. There is no showing in the record that appellant will ever be able to get Campbell into court. But way and beyond that there is no avowal in the record as to what Campbell would testify to if he were present in court. This being the state of the record, it cannot be said that there is any ground for reversal here.

Perceiving no error in the judgment below, it is affirmed.