## Dyche v. Scoville.

(Decided Oct. 15, 1937.)

A. T. W. MANNING and EDWARD H. HAYS for appellant.
MURRAY L. BROWN and WILLIAM LEWIS for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

This is an appeal from a judgment of the Laurel circuit court in a contested election case, wherein the special judge who sat in trial, held that appellee was duly chosen by the voters as the nominee of the Republican Party for the office of county jailer. The primary election was held on August 7, 1937; appellant and appellee with three others were candidates. Appellee received a plurality of 208 votes, and was awarded a certificate. Appellant in his contest petition alleged that appellee was not legally elected because he had by himself, his kinsmen, friends and supporters, with his knowledge and consent, violated the Corrupt Practice Act (Ky. Stats. 1936, sec. 1565b-1 et seq.); the petition enlarging the general allegation by more specific pleading.

There is no question presented here of procedure or practice; the decision of the lower court turning alone on the evidence, its weight and effect. Twenty-one witnesses testified on behalf of appellant, including appellant and appellee; the latter introduced by appellant and testifying as if on cross-examination. At the conclusion of appellant's testimony, appellee moved the court to enter judgment in his favor, because of a failure of proof sufficient to substantiate the allegations of the petition. This motion was sustained; the court adjudging as above recited, and dismissing the petition. Contestant appeals.

In rendering judgment the court gave in writing his reason therefor; and we deem it not out of the way to incorporate some excerpts at this point:

"The court is of the opinion that the plaintiff has failed to make out a case by substantial and reliable evidence that the defendant, Chester Scoville, or any one of his friends or supporters, with his knowledge or consent, violated the Corrupt Practice Act during the progress of said election, either by bribing or buying of votes, or inducing persons to vote for him for pay, or by the expenditure of any

sum greater than he might legally spend during the progress of said election."

The court then details the testimony of some of the witnesses and calls attention to the fact that appellee, introduced by appellant, had unequivocally denied the charges, as herein later detailed, by four or five witnesses, and after carefully analyzing the testimony, which we have also done, wrote:

"The court saw and observed these witnesses and their conduct and their manner of testimony, and the court does not believe that the defendant should be deprived of his nomination upon the testimony of these witnesses, or any other evidence offered upon behalf of the plaintiff in this case, and the court finds, holds and adjudges that the plaintiff failed to make out a case by substantial and creditable testimony."

The contention here that the court was in error in finding for appellee is based almost entirely on the argument that various witnesses, who testified to certain acts of appellee, stand unimpeached, and that admissions made by appellee tend strongly to corroborate the testimony of appellant's witnesses, or some of them. Charley Parsley testified that on the morning of the election appellee came to his house and gave him $2, and called his wife out and gave her a like sum. He does not say there was any agreement to vote for appellee. He does say, "He was wanting me to vote for him." The wife had not decided whether she would attend the election, and witness said that appellee told her, "If you can't vote for me don't go to the election." He says he knew appellee because they were in school together when they were children. Appellee denies that they were ever in school together. This witness does not, as far as we perceive, say that he agreed to vote or voted for appellee, or voted at all. His wife did not go to the polls. Parsley was at the time registered as a Democrat. The wife says she did not promise to vote for appellee, nor did she promise that she would stay at home. She testified, substantially, as did the husband.

John Higginbottom testified that Ed Bender was at his house the day before the election, and said he was "talking for Chester Scoville. He brought a sack of meal, bucket of lard and two pounds of sugar." Chester Scoville was not there, and Bender says he never saw

him, "until today, except when his father was sheriff several years ago."

Kissie Rogers didn't know appellee until he came to her home on election morning, and took her, her husband and daughter Laura to the polls. He brought them home, and "when we were getting out of the car he turned around and started back and said 'here' and we took it." "He gave us a dollar apiece." It will be noted that nothing was said by the witnesses as to appellee requesting that they or any of them vote for him, or as to any promise on their part to vote for him, or as to how they finally cast their votes.

Witness said:

"He never named about voting at all, only he asked us did we know it was voting day, and we told him 'yes' that we were aiming to go after a while; that we were in no hurry."

"Q. Did he tell you he was a candidate? A. No, he never did say, but we knew he was a candidate."

Chester Robinson saw appellee and Ed Bender in the back of the courthouse on the evening before the election, and said that "Chester gave Ed something or other, but I wouldn't state exactly what it was. It was some kind of paper or something or other rolled up. I didn't see it good; it was a little package, and Ed put it into his pocket." On redirect examination he said:

"Well, it was something like, oh, just a common size envelope with six or seven pages of letters, or a number of tablet leaves rolled up in a letter or something like that."

One witness stated that on the day of the primary he saw W. N. Scoville (appellee's uncle) inside the sheriff's office, facing a colored woman, and Mr. Scoville was standing with his hand "this way," and the "woman was putting some bills down in her pocket-book. It looked like paper money." She did not see appellee, and no connection is shown between appellee and the uncle, except he was electioneering for Chester Scoville. She also says she saw a "good many" colored people go in and come out of the sheriff's office during the day.

Bert Gillispie, bank official, said that the bank made a loan of $4,000 to W. N. Scoville some time in July.

The proceeds were not deposited in his bank. He made no loan to Chester Scoville. He was informed by W. N. Scoville (who was in the milling business) that the proceeds of the above loan were to be used in buying wheat.

Sherman Holmes saw W. N. Scoville on the day of the primary near precinct No. 4, in the hallway of the courthouse. ''He was just mixing around in the crowd, and I seen him hand some few of the colored fellows some money.'' He did not know how much.

Maggie Frederick saw appellee on election day and he gave her $5 to help build a new Holiness Church. She was a voter; the money was given to her openly while other people were standing around the election grounds; many were voters and members of her church. On cross-examination she said the money was to be used in building the new church, and she ''turned it in for that purpose.'' He had theretofore promised to contribute, and she saw him election day and reminded him of the promise, and he paid up. Neither said anything at all about voting.

The foregoing is a fair resume of the evidence upon which appellant relies for a reversal of the judgment of the trial court. Other witnesses do not relate facts which would in the least create a suspicion. Most of it is of a decidedly negative quality; so much so that it is not discussed in brief.

It is not necessary to make reference to the testimony of appellant, since his testimony does not contain any specific charge against appellee, or undertake to detail anything save his activities, going to show, and showing, that he did not in any way violate any provision of the Corrupt Practice Act.

Appellee testifying at the behest of appellant, as if on cross, says he never discussed the campaign with his uncle, but knew he was active for him. Nor did he discuss the subject of spending money in the campaign with him. He knew Bender, but did not see him on Friday before the election; he knew Bender was for him, but had no arrangement with him regarding the campaign. Witness said he borrowed $200 and had $160 contributed, but that he did not spend that much in the campaign. He did not know Parsley. He said, ''I may know his wife, but I did not give them money on election day.'' He did haul the Rogers family to the polls and asked them to vote for him, but does not recall

whether they agreed to do so. He did not give them any money.

There is a total lack of testimony by which the actions of W. N. Scoville or Ed Bender can be charged to appellee; there is an entire absence of proof that he had any knowledge of their alleged activities. This is true as to any stated activity of W. N. Scoville on the day of the election.

"Corrupt Practice Act does not fasten liability on candidate by application of doctrine of 'imputed knowledge,' but actual knowledge of illegal acts is essential." Prewitt v. Caudill, 250 Ky. 698, 63 S. W. (2d) 954, 955.

"Actual knowledge of the candidate of the illegal acts of another in his behalf is an indispensable element to be established. It cannot be inferred from merely suspicious circumstances of a vague character." Douglas v. Greene, 231 Ky. 44, 20 S. W. (2d) 1026.

We think these authorities fully dispose of all questions relative to activities of others than appellee himself. We disposed of the "church contribution" question in Asher v. Broughton, 231 Ky. 165, 21 S. W. (2d) 260. In that case we held that contributions to a church are not to be treated as campaign expenses, and not violative of the act if made bona fide and not shown to have been made under a mark of hypocrisy.

This leaves only for our consideration the alleged activities of appellee, recounted above, and, as we gather from the argument of counsel, these activities constitute such a violation of the Corrupt Practice Act as would authorize us to declare appellee's nomination void. We are not unmindful of the fact that we have held, in effect, that the bribery of one vote by a candidate, or some one acting for him and with his knowledge, constitutes such a violation of the Corrupt Practice Act as might deprive the candidate of his nomination, if such bribery was satisfactorily shown. Burke v. Greer, 197 Ky. 555, 247 S. W. 715; Bingham v. Smith (Bingham v. Duff), 210 Ky. 256, 275 S. W. 811, both cited in Combs v. Brock, 240 Ky. 269, 42 S. W. (2d) 323.

The judge who presided on the trial below said very definitely that the charges were not "satisfactorily proven." Counsel's argument is that they were so proven because the testifying witnesses stand unimpeached. It is true that no one came forward to attack the reputations of the witnesses for truth and veracity.

In this respect they were not impeached; but this failure did not deprive the trial court from giving his estimation of the weight of the evidence, such as was produced. The appellee denied unequivocally, the giving of money for any purpose. The witnesses do not make it plain that the alleged giving of the money was for the purposes of bribery, or with the intention of bribing. In this respect the testimony is not satisfactory.

The question, therefore, comes down to the narrow one of the belief of the trial judge as to which of the witnesses were adhering to the truth. He, as does a jury, sitting in the trial of a common-law action, has the right to believe or disbelieve, and his conclusions are not to be disturbed here unless we find the preponderance of evidence to outweigh his determination. Ray's Ex'r v. Bridges, 247 Ky. 459, 57 S. W. (2d) 492; Crowe v. Miller, 239 Ky. 444, 39 S. W. (2d) 693. Neither judge nor jury need accept witnesses' literal statements as true if they contain improbabilities, or if reasonable grounds exist for concluding that they are not wholly true. Probative or "satisfactory" evidence is that character of testimony carrying the quality of proof and having fitness to induce a conviction of truth, consisting of facts and reason blending as co-ordinate factors. Globe Indemnity Co. v. Daviess, 243 Ky. 356, 47 S. W. (2d) 990.

In Howard v. Parsons, 242 Ky. 704, 47 S. W. (2d) 545, 546, an election contest in which there was more and much stronger proof of alleged corruptions than appears here (though there some of the witnesses stood impeached), the court heard the proof orally (as was done in this case) and dismissed the petition, and we said on review:

"In such cases 'necessarily the finding of the fact made by the trial court should be given considerable weight by us on appeal.' Baker v. Colson, 210 Ky. 277, 275 S. W. 879. In this case the witnesses were heard in open court, and the rule is especially applied where the judge sees and hears the witnesses."

Even should we hold a doubt (which we do not) as to the correctness of the court's conclusion, we should, under our repeated rules, resolve that doubt in favor of the court's finding. Salisbury v. Moore, 253 Ky. 744, 70 S. W. (2d) 529; Bargo v. Tedders, 254 Ky. 341, 71

S. W. (2d) 660, all election contest cases, as was Salyer v. Gross, 253 Ky. 296, 69 S. W. (2d) 376, in which the proof was heard orally.

After a careful reading of the entire testimony heard by the court on the trial below, we are of the opinion that appellant failed to prove satisfactorily any violation of the Corrupt Practice Act by appellee, and did not prove any act on the part of his friends, relatives, kinsmen, or agents, which, if amounting to evil practice as defined under the law, came remotely to his knowledge. The court below so found, and we concur in his finding.

Judgment affirmed.