## Ward v. Salyer.

May 17, 1940.

John Noland, Special Judge.

Scott E. Duff, C. A. Noble, W. O. Miller and W. A. Stanfill for appellant.

T. E. Moore, Jr., R. T. Moore and A. T. W. Manning for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Affirming.

In the 1939 November election, the appellant was the Republican nominee and the appellee the Democratic nominee for the office of circuit judge of the thirty-third judicial district, composed of Leslie and Perry counties. Appellee carried Perry county by 398 votes while appellant carried Leslie by 811, which elected him by 413 votes. Within the statutory period appellee instituted this action to contest appellant's election on two grounds; (1) Appellant had violated the Corrupt Practice Act, Sec. 1565b-1 et seq., Ky. Stats., by bribing voters with money, liquor, official favors, and by intimidating them; (2) a conspiracy was entered into between appellant and his supporters, whereby they tampered with and altered the ballots in Leslie county; that the ballot boxes were not properly locked as required by Sec. 1468, and were not guarded as required by Sec. 1482, Ky. Stats. Appellee asks that the Leslie county vote be thrown out and he be declared elected; or if that be not done, it be adjudged there is a vacancy

in the office of circuit judge in the district because of appellant's violation of the Corrupt Practice Act. Other issues were raised by the pleadings but little proof was taken thereon and as they were abandoned in the briefs, we will not refer to them.

The record presents no question of procedure or practice and the case is solely one of fact. Hon. John Noland was designated as special judge to try the case and on appellant's motion, and over appellee's vigorous objections, the evidence was heard orally before him, being reported by the official stenographer, and is here by virtue of a bill of exceptions. Judge Noland, after hearing the testimony of 194 witnesses, rendered judgment that the evidence failed to show any changes or alterations were made in the ballots and dismissed that ground of the contest, but that the appellant had violated the Corrupt Practice Act in securing his election and was not entitled to the office, which was adjudged to be vacant. Appellant prosecutes an appeal and appellee a cross-appeal from that judgment.

The evidence relates to seven instances wherein appellant is charged with bribing voters himself or furnishing money to others to be used for that purpose; to four instances charging the use of whiskey by others with his knowledge; to four instances of alleged intimidation by him; to five instances charging him with promising to grant judicial favors in return for political support. As we have concluded appellant violated the Corrupt Practice Act in bribing Jay Feltner and Elim Williams, we will forego a discussion of the other instances referred to in the evidence. and not unnecessarily prolong this opinion, since one violation of the Act is sufficient to deprive one of the office to which he has been elected. Combs v. Brock, 240 Ky. 269, 42 S. W. (2d) 323; Dyche v. Scoville, 270 Ky. 196, 109 S. W. (2d) 581; Scalf v. Pursifull, 250 Ky. 447, 63 S. W. (2d) 504.

Sophia Sizemore testified that on election day in the Hyden court-house she saw appellant in conversation with Jay Feltner, who told Jay to go see Curt Duff (the sheriff of the county and one of appellant's staunch supporters). Jay then went into the sheriff's office and she heard Duff say to him, " 'I'll make it all right', and gave him something in his hand. I won't say for sure it was money or not." Jay was put on the stand by ap-

pellee and testified appellant asked him if he were going to vote for him, and he said, "Yes, sir". When asked if appellant promised to pay him $1 for "his day", his reply was, "I couldn't remember". He admitted he knew Curt Duff and that he was in his office on election day. When asked if he got any money from Curt that day he answered, "I couldn't state that 'plime blank' now since I thought the matter over". Asked if he had not made an affidavit that appellant agreed to pay him $1 for "that day's work", and if Duff had not paid him the money in the sheriff's office, he replied that he had made such an affidavit. The next question, "Was it true? A. I thought it might be true".

In Scalf v. Pursifull, 250 Ky. 447, 63 S. W. (2d) 504, comment was made as to the difficulty of correctly appraising such testimony. as now confronts us and it was pointed out that each such case stands on its own legs. A citizen who sells his vote occupies a low place in society and oftentimes is not averse to selling his testimony. It is to be expected that the giver of the bribe, who is usually more affluent and occupies a higher social position than his victim, will deny it; and if it becomes expedient to do so, will buy the testimony of the witness with no more hesitancy than he purchased his suffrage. In weighing evidence in election contests where bribery is the issue, courts must consider the interest of the person who is charged with bribery, the facts and circumstances surrounding each alleged participant, the character of the witnesses, their demeanor on the witness stand and the convincing force of their testimony in the light of the surroundings. It is manifest this can best be done by the trial judge who is on the ground, perhaps knows the parties and witnesses, and has the great advantage of meeting them face to face while they are on the witness stand. He has the opportunity to observe whether beads of perspiration break out on the brow of the witness, their facial expressions, whether they swallow when there is nothing to swallow, or whether they yawn while testifying, the tone of their voices, and whether they look the court, or opposing counsel and parties, squarely in the eye; or whether they drop their eyes, heads and voices, or start perspiring, swallowing or yawning as only untruthful witnesses can.

Jay Feltner contradicted himself in a way on the

stand, but it is evident, as remarked by the trial judge, he was an unwilling witness. His effort to evade and his equivocations were the most convincing bits of his testimony. He impresses us as a man doing his utmost to prevent divulging the fact that appellant had bought his vote. When he stated he had made an affidavit to that fact and he "thought it might be true", he convinced us that appellant bought his vote for a dollar and that he was paid therefor by Duff, even though both appellant and Duff deny the fact and Sophia Sizemore is impeached. We surmise this same circumstance likewise convinced the trial judge of that fact.

We pass now to Elim Williams. He testified that several days before the election appellant picked up him and his 20 year old boy, Adam Williams, near Allais and let them ride about a mile and a half to the mouth of Lotts Creek. The election was brought up and appellant asked him how many voters there were in his family, and he told him seven; that appellant asked him to help him in the election and gave him 15 one dollar bills to spend for that purpose; that he took the money, bought three pints of whiskey from Bill Carter to use in the election, paid $2 of it to Jim Fugate on the day of the election, and gave some to the members of his family. Elim testified he had known appellant four or five years but appellant had never talked to him before about the election, and that he was not in the habit of handling money in elections. He was corroborated by his boy who testified he was in the back seat of the car. Although the boy could not say what day of the week this occurrence happened or what month it was, and did not know what day of the week the election came on, he did testify very clearly and convincingly that he and his father had been to town in an attempt to get him on WPA on the day appellant picked them up in his car. Appellant testified he picked up so many people on the road he could not say whether or not he took these two men in his car, but stated he did not know either of them and emphatically denied he gave Elim $15. Two Jim Fugates lived in Elim's district and each testified Elim never gave him $2.

It is vigorously argued it would be contrary to human experience for appellant to pick up a man on the road with whom he had never discussed politics or the

election and hand him $15 to spend for him in the election, especially after appellant had so recently wrested the Republican nomination from an opponent by reason of his having violated the Corrupt Practice Act. We cannot agree with this line of reasoning. If appellant believed Elim had seven votes in his family, he could very logically reason that with this $15 he not only could get the seven votes in Elim's family, but that these voters could reach many of their friends and associates and for this $15 he might receive more than 15 votes. It well may be considered a subtle and effective way of buying votes to find a man with a large number of votes in his family and give him $15 to be used in the election. We can easily imagine such procedure is not so embarrassing to the person receiving the money as if an outright purchase were made of his vote, and it might be concluded he would be more loyal and more active since the briber was attempting to put the whole transaction on not so sordid a plane. We have often thought that most bribers of voters operated in an indirect manner, such as paying for the day lost at the polls, or for some fictitious services performed, or to be performed, rather than to come out boldly and buy a voter the same as he would buy a hog, a mule or a cow.

It is further argued that Elim was impeached, that appellant did not know him, and under such circumstances it would be unreasonable to give any weight to his testimony. Three men, Andrew Smith, Walter Campbell and Bill Napier, testified Elim's moral reputation was bad; that he sold liquor and gambled. At least one of the three, Bill Napier, testified he never heard Elim accused of "lie swearing". We are not greatly impressed with their impeaching testimony. In this trial impeaching witnesses seems to have been the order of the day and but few on either side who testified to material facts escaped. There are instances where ex-convicts were used to impeach witnesses, and where a witness who had been impeached was used to impeach another witness. Indeed, eight witnesses testified appellant's moral reputation was bad which we conclude was introduced to effect his credibility as a witness, Section 597, Civil Code of Practice; Crawford v. Com., 281 Ky. 557, 136 S. W. (2d) 754. We are unable to say whether the trial court believed appellant or Elim, but he must not have believed appellant since he found that

he had violated the Corrupt Practice Act, after appellant had made both a categorical and sweeping denial of that fact.

Appellant further argues that an election should not lightly be set aside, and it is only where it is shown by unimpeachable evidence that the contestee violated the Corrupt Practice Act, or that it was violated with his knowledge and consent, that the will of the people should be thwarted, citing Napier v. McIntosh, 220 Ky. 539, 295 S. W. 856; Prewitt v. Caudill, 250 Ky. 698, 63 S. W. (2d) 954; Howard v. Whittaker, 250 Ky. 836, 64 S. W. (2d) 173, and several other cases. We are in thorough accord with this principle, but as was written in Hibbard v. Page, 230 Ky. 638, 20 S. W. (2d) 475, 476:

> "When there is proof that the provisions of the act have been violated, the court should not lightly ignore the proof upon the evidence of those who are charged with having violated the law".

As we have pointed out above, the trial court heard the evidence orally and had the advantage of observing the witnesses and parties in court, and where there is a sharp conflict in the evidence, as here, we are loath to override the findings of the trial judge, and will not do so unless we believe the evidence preponderates against his findings. Even if our minds are left in doubt as to the correctness of the trial judge's conclusion, we will, under long established rules follow him. Smith v. Ward, 280 Ky. 173, 132 S. W. (2d) 762; Wheeler v. Marshall, 280 Ky. 55, 132 S. W. (2d) 519; Dyche v. Scoville, 270 Ky. 196, 109 S. W. (2d) 581; Salyer v. Gross, 253 Ky. 296, 69 S. W. (2d) 376.

Appellee makes much of appellant's causing the arrest of a witness at the outset of the trial on a perjury charge, contending it was an attempt to intimidate witnesses and prevent them from testifying against appellant. The trial court immediately stopped such procedure by contempt proceedings. Appellant is vigorous in his argument that friends and supporters of appellee were combing the county for witnesses against him and taking false affidavits and attempting to bribe witnesses to give false testimony. All of this was fully brought out in evidence and we are confident the trial judge took same into consideration in arriving at the proper weight

to be given the testimony of the various witnesses, as have we, and it is not necessary for us to enter into a discussion of these charges and counter-charges.

There is some testimony that the ballot boxes were not equipped with the character of locks provided in Sec. 1468 of the statutes, and that the key of the Democratic Election Commissioner, George Sizemore, would not unlock any of the three locks on some of the boxes; that from the time the boxes were returned to the county court clerk's office after the election and until the count was completed they were not guarded as required by Sec. 1482 of the statutes, and there was an opportunity for designing persons to tamper with or alter the ballots, hence we should invalidate the entire returns from Leslie county and declare appellee elected upon the returns from Perry county. The evidence shows neither appellant nor appellee requested that the boxes be guarded and no guard was asked by any representative of the Democratic or of the Republican parties. There is no evidence whatever of any molestation or alteration of the ballots, and we decline to disfranchise the voters of Leslie county on account of some irregularities of its officers, since we are confident the integrity of the ballots has been preserved, Raymer v. Willis, 240 Ky. 634, 42 S. W. (2d) 918; Hogg v. Combs, 250 Ky. 400, 63 S. W. (2d) 465.

The judgment is affirmed on appeal and on the cross-appeal.

Whole court sitting, except Judge Rees who was absent.

Judges Fulton and Tilford dissenting.