## Bartley v. Potter.

May 1, 1942.

Francis M. Burke and J. Erwin Sanders for appellant.

A. F. Childers for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Parties above were candidates at the 1941 general election for justice of the peace in magisterial district No. 3, Pike County. Bartley was the Democratic and Potter the Republican nominee. The election commissioners upon canvass found that Bartley had received 670 votes and Potter 682. Within the statutory period

510

appellant filed his contest petition, specifically charging
that Potter and associates, acting in cooperation with
friends and relatives, with approval of the candidate, had
raised and pooled $2,000, for the purpose of corrupting
the voters of the district, which sum was disbursed and
distributed to corrupt and bribe voters whose ballots
went to make up the apparent majority of appellee. It
was charged that Potter and his supporters purchased
votes and used large quantities of liquor for the purpose
of bribing voters, all in violation of the Corrupt Practice
Act, Kentucky Statutes, Section 1565b-1 et seq.

It was charged that in Marrowbone precinct, 46 vot-
ers cast their ballots openly without being previously
sworn as to existing disability; that in Sycamore pre-
cinct and Poor Bottom 6 voters cast their ballots openly
under the same circumstances, all counted for appellee.
On the two grounds alleged it was prayed that appellee's
certificate be cancelled, and appellant be adjudged legal-
ly elected, and in the alternative, if it be not finally de-
termined that appellant received a majority of the legal
votes, then the election to be held void. An amended pe-
tition added the names of voters who had voted "on the
table" in Rockhouse precinct.

Potter denied the material allegations of the peti-
tion. In counterclaim he alleged that in Hellier precinct
a nonresident, Mrs. Lakin, had voted and the vote was
counted for appellant. The same was alleged as to 7
voters in Lookout precinct, in which one voter illegally
voted openly. The same charges were specifically made
as to several other precincts within the district, the num-
ber of illegal votes charged being sufficient to reduce ap-
pellant's certified vote. Added was the charge that in
Rockhouse precinct the "chain ballot" system was used
by 11 or more supporters of appellant.

Appellee asked that the petition be dismissed and he
be declared legally elected. In reply Bartley denied the
allegations of the counterclaim, and issues were raised,
except that appellee was allowed to file an amended an-
swer fortifying allegations of his counterclaim, which
did not alter issues.

The proof was taken by depositions; upon submis-
sion, on pleadings and proof, the chancellor adjudged
that "in their campaign leading up to the election," both
parties were guilty of violation of the Corrupt Practice
Act by the illegal use of money and whisky to promote

their election, with the knowledge of both contestant and contestee. The court expressed the opinion that from an inspection of the whole record, there was such fraud, bribery and illegal voting, including the use of the "chain ballot" and lack of secrecy in the casting of ballots, it was impossible to determine that either party had been fairly elected or "which received a majority of the legal votes cast at said election." The court then adjudged no election, and declared the office to be vacant, and cancelled appellee's certificate. Both parties obpected, prayed and were granted appeals; appellant filed the transcript, and this court has sustained appellee's motion for cross-appeal.

The evidence adduced by appellant to some extent sustains the charge that there was a "slush" fund raised by those interested in the success of the Republican candidates, and fairly establishes that more than 35 votes were cast for the appellee under circumstances, which in the absence of contrary evidence justified the chancellor in deducting at least that number of votes certified on behalf of appellee. These votes consisted in the greater part of votes marked openly "upon the table," in cases where there was no such disability shown or claimed, which would have justified the vote being cast otherwise than in the secrecy of the booth, in many instances being stenciled by the election officers. The remaining number of illegally cast ballots were by persons shown to have been nonresidents of the district, or the particular precinct in which cast.

Elster Ratliff used about $75 or $100 in Hellier precinct; he was an active worker for the Republican ticket. He hired "two or three cars for one thing," and paid for the use and operation. That he used money for illegal purpose is shown by his own evidence, as he admits he gave a colored man $2 to influence his vote. He did not know how many he bought; did not remember the names, "but I just look at a fellow and something tells me he might be that kind of a fellow and I tackle him." The money was given him by Ira Deskin, a package of $1 bills marked "Hellier." This man was apparently a distributor, since he distributed packages to perhaps all the nine precincts in district No. 3; all were $1 bill packages. One of these packages was delivered in Sycamore precinct to appellee by witness, who says he did not tell him what to do with it because "I figured that he would know

as much about it as I did. I just told him there was a package for him."

In this precinct there can be little doubt but that supporters of both political parties had and used money to influence votes, the price a little higher than is usual, from our observance, from two to five dollars. Appellee, as we view the record, does not contradict Ratliff's testimony, and we note in his pre and post election accounts filed, he shows expenditures of only $6.29, by himself or by others in his behalf. In his testimony appellee said the amounts set up in his verified accounts showed all that he spent himself, and said that the "fight" was made for the entire ticket; no one was particularly active in his behalf at his request. He depended upon the organization. Certainly there was, to some extent, a general distribution of packages of $1 bills to workers at the polls, all however to be used, as per witnesses, for cars, strikers and workers, the sums in our estimation somewhat out of proportion. There is also evidence of open use of intoxicating liquor in various of the precincts by workers.

While as a general proposition appellee is not shown by the proof to have had general knowledge of the use of money or whisky for sinister purposes, his failure to explain what was done with the package of money given him by Ratliff, or to include it as a contribution in his expense account, or to otherwise account for its legal use, violated the provisions of the Corrupt Practice Act as construed in Horn v. Wells, 253 Ky. 494, 69 S. W. (2d) 1011, though as we have concluded, as manifested above, the records show that the illegal votes cast for him would reduce his majority by more than 12, the returned majority. However, this conclusion is far from justifying us in holding that appellant is entitled to a certificate of election, since it is clear that he violated the provisions of the act, and we need go no further than his own testimony to demonstrate the fact.

Dell Bowling says that on the day of the election he borrowed $2 from appellant for the purpose of buying liquor. Appellant admits that on election day the witness, who was then intoxicated, approached him on the election ground, and saying that he had been drunk the night before, demanded $2. In order to be rid of him appellant openly gave him the amount demanded.

Another witness testified that on the night before election appellant gave him $15 to go to Pikeville and buy liquor. Appellant admits the giving of the sum, but said it was for the purpose of getting out the vote in Bowling Fork precinct. Witness says he purchased four gallons of whisky, which was distributed to two or three voting precincts. The one and a half gallons taken to Bowling Fork precinct, "near by the election grounds," and given to "some who was voters and some who wasn't," of course, according to witness "it was not for the purpose of influencing voters." It does not appear that appellant included this $15 in his post election expense account.

Another witness testified that on the afternoon before the election appellant gave him $4 and a pair of overalls, to work at Poor Bottom precinct. Witness says this did not influence his vote. Appellant says he gave witness $3 on the day of election to work at the polls; he did not give him the overalls. He also gave a poor crippled man overalls and a pair of socks, purely as a matter of charity.

Marcus Bowling said that appellant gave him $2 the day before election, and told him to buy liquor for himself and friends. Appellant says he was approached by either Bowling or Hillard Bartley, and one of them wanted a little money to get a drink of whisky, as they had to haul coal that night, he gave it to one or the other of the two. Both said they were supporters of appellant; he thought they could not be influenced with money, and they agreed. At this point it may be said the foregoing item, and some others above mentioned, were not evidenced in filed expense accounts, appellant explaining omission because they were neighborly and charitable acts. There were other witnesses who testified that appellant gave them small sums on the day of, or preceding the election; appellant denied these statements.

That there was a pool by the Democratic candidates to further the interest of candidates on the Democratic ticket is established beyond peradventure. Some candidates, or their friends for them, contributed as much as $2,000, or more, this fund reaching the somewhat staggering proportions of $12,000, which, as we read the proof, was distributed to various precincts on the evening before election.

It does appear from the record that appellant's financial condition was such that he could not contribute to any extent, and he says he had no knowledge of these contributions, or the use of the funds which, we may say, were not used for any particular candidate, but for all candidates of the party. However, there is one incident which brought home to him that there was money available for use on election day, though contended, only for the purpose of bringing out the vote.

One witness, who was apparently active in the election for the Democratic candidates, testified that on the day before the election he picked up from a table in a room at the Hatcher Hotel a package of money, which it developed was the pro rata to be used in magisterial district No. 3. It developed that the amount was $900, which without doubt was distributed, package by package, to the nine precincts (or some of them) in district No. 3.

Prior to the election the witness had told appellant to make arrangements for the employment of carriers and workers in three precincts. Appellant gave him the names of workers and carriers, and witness placed in envelopes the previously agreed amounts and turned them over to appellant; apparently these envelopes were delivered by appellant, and whether or not it appears that all persons paid did actual service, appellant did report payment in his expense account to five or more persons for work and carrying, ranging in amounts from $5 to $15. Appellant says he did not know of the use of any other money in furthering his interests, or the interests of any other candidate on the ticket.

We hardly think it necessary to go into any further resume of the evidence adduced by appellee, which not only tended to indicate, but to our minds unmistakably showed appellant to have violated the provisions of the Corrupt Practice Act, and hence is in no position to assert his right to a certificate of election, because of his claim that he received a majority of legal votes cast. If we should thus hold, we would close our eyes to the many decisions of this court touching the question, wherein we have held elections void because of violations of the act, on testimony not nearly so persuasive as presented here. Nor need we quote from those opinions, but as peculiarly fitting and applicable, we may refer the reader to Scalf v. Pursifull, 250 Ky. 447, 63 S. W. (2d) 504; Dyche

v. Scoville, 270 Ky. 196, 109 S. W. (2d) 581; Combs v. Brock, 240 Ky. 269, 42 S. W. (2d) 323; Davisworth v. Middleton, 288 Ky. 77, 155 S. W. (2d) 450, and as fittingly applicable to the instances where appellant admitted giving money on the day of or just before the election, reference is made to the recent case of Carter v. Lambert, 288 Ky. 39, 155 S. W. (2d) 38.

Aside from what we have said so far, there is ample grounds to uphold the finding of the chancellor. In one precinct there was proof, uncontradicted, of the use of the "chain ballot," in casting of at least ten votes. The proof does not go far enough to show how these votes were cast. The same is to a considerable extent true as to votes openly cast without complying with statutory provisions, and likewise as to a small number of votes cast by non-qualified voters. That there was extensive use of money and intoxicating liquor, used about or upon the election grounds on the day of election, and at other places on the eve of election for influencing votes, is beyond dispute.

A minor point of procedure is raised by appellant. It is correctly charged that appellee in his counter contest did not allege violation of the Corrupt Practice Act by appellant. However, as we observe the pleadings it was alleged as the basis of appellant's claim to the certificate that he had received a majority of the legal votes, and had filed his expense account showing all expenditures, and had in no manner violated the Act. This was specifically denied by appellee, thus raising an issue of fact upon which appellant's alleged right depended. In addition to this appellant alternatively plead that if the facts should justify, the court should adjudge no election. We think the contention is untenable.

There are also motions by appellee to strike certain portions of the record, due to an alleged failure to comply strictly with the rules in relation to the filing of transcripts in this court. This motion and countermotion of appellant to be allowed to proceed upon original papers were passed to the merits of the case. The sustaining of appellee's motion would have the effect of leaving the judgment of the court in status quo, and since we have chosen to discuss the case from the standpoint of merit there is no necessity for passing on this procedural question.

Judgment affirmed.